**Compression Labs, Incorporated v. Agfa Corporation et al.,**
**C.A. No. 2:04CV-158 DF**


**Motion to Dismiss Under Fed. R. Civ. P. 12(b)(7), or,**
**in the Alternative, Motion to Transfer**


**Attachment A to the**
**Declaration of Joseph M. Casino**


**PART 1 OF 3**

Dockets.Justia.com

04-81c

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

AGFA CORP., et al.
(Complete list of plaintiffs attached hereto)

**DEFENDANTS**

COMPRESSION LABS, INC., FORGENT NETWORKS, INC., AND GENERAL INSTRUMENT CORP.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Richard L. Horwitz, Esq. (#2246)  David E. Moore, Esq. (#3983)
William J. Wade (#704)
Josy W. Ingersoll (#1088)  Adam W. Poff (#3990)
(Complete information attached hereto)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. Sections 2201, 2202; 28 U.S.C. Sections 1331, 1337, 1338; 15 U.S.C. Sections 4, 15, 16, 26; 28 U.S.C. Section 1367

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE 07/02/2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

### IN THE UNITED STATES DISTRICT COURT
### FOR DISTRICT OF DELAWARE

**Agfa Corp.**, a Delaware corporation;                                )
**Dell Inc.**, a Delaware corporation;                                 )
**Gateway, Inc.**, a Delaware corporation;                             )
**Hewlett-Packard Co.**, a Delaware corporation;                       )
**JVC Americas Corp.**, a Delaware corporation;                        )
**Macromedia, Inc.**, a Delaware corporation;                          )
**Matsushita Electric Corp. of America**,                              )
a Delaware corporation;                                                )
**Mitsubishi Digital Elecs. Am. Inc.**,                                )
a Delaware corporation;                                                )        C. A. No.. _____
**Oce North America, Inc.**, a Delaware corporation;                   )
**palmOne, Inc.**, a Delaware corporation;                             )
**Ricoh Corp.**, a Delaware corporation;                               )
**Riverdeep, Inc.**, a Delaware corporation;                           )        **DEMAND FOR JURY TRIAL**
**Savin Corp.**, a Delaware corporation;                               )
**Thomson, Inc.**, a Delaware corporation;                             )
**Apple Computer, Inc.**, a California corporation;                     )
**Axis Comms., Inc.**, a Massachusetts corporation;                    )
**Canon USA, Inc.**, a New York corporation;                           )
**Eastman Kodak Co.**, a New Jersey corporation;                       )
**Fuji Photo Film USA**, a New York corporation;                       )
**Fujitsu Computer Products of America, Inc.**,                        )
a California corporation;                                               )
**International Business Machines Corp.**,                              )
a New York corporation;                                                )
**Jasc Software, Inc.**, a Minnesota corporation;                      )
**Toshiba America Consumer Products, LLC**,                            )
a New Jersey corporation; and                                          )
**Xerox Corp.**, a New York corporation,                               )
                                                                       )
                        Plaintiffs,                                    )
            v.                                                         )
                                                                       )
**Compression Labs, Inc.**, a Delaware corporation;                    )
**Forgent Networks, Inc.**, a Delaware corporation;                    )
and **General Instrument Corp.**, a Delaware                           )
corporation,                                                           )
                                                                       )
                        Defendants.                                    )

POTTER ANDERSON & CORROON LLP

By: _____
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza 6th Floor
     1313 N. Market Street
     P.O. Box 951
     Wilmington, DE  19899
     (302) 984-6000

*Attorneys for Plaintiffs*
*Agfa Corp.*
*Apple Computer, Inc.*
*Axis Comms., Inc.*
*Canon USA, Inc.*
*Dell Inc.*
*Eastman Kodak Co.*
*Fuji Photo Film USA*
*Fujitsu Computer Products of America, Inc.,*
*Gateway, Inc.*
*Hewlett-Packard Co.*
*International Business Machines Corp.*
*Jasc Software, Inc.*
*JVC Americas Corp.*
*Matsushita Electric Corp. of America*
*Oce North America, Inc.*
*palmOne, Inc.*
*Ricoh Corp.*
*Riverdeep, Inc.*
*Savin Corp.*
*Thomson, Inc.*
*Toshiba America Consumer Products, LLC*
*and Xerox Corp.*

Dated:  July 2, 2004

RICHARDS, LAYTON & FINGER, P.A.

By: _____
     William J. Wade (#704)
     One Rodney Square
     920 N. King Street
     Wilmington, Delaware 19899-0551
     (302) 651-7700

*Attorneys for Plaintiff*
*Macromedia, Inc.*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

By: _____
     Josy W. Ingersoll (#1088)
     Adam W. Poff (#3990)
     The Brandywine Building
     1000 West St., 17th Floor
     Wilmington, DE  19801
     (302) 571-6681

*Attorneys for Plaintiff*
*Mitsubishi Digital Elecs. Am. Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF DELAWARE

| | |
|---|---|
| **Agfa Corp.**, a Delaware corporation; | ) |
| **Dell Inc.**, a Delaware corporation; | ) |
| **Gateway, Inc.**, a Delaware corporation; | ) |
| **Hewlett-Packard Co.**, a Delaware corporation; | ) |
| **JVC Americas Corp.**, a Delaware corporation; | ) |
| **Macromedia, Inc.**, a Delaware corporation; | ) |
| **Matsushita Electric Corp. of America**, | ) |
| a Delaware corporation; | ) |
| **Mitsubishi Digital Elecs. Am. Inc.**, | ) |
| a Delaware corporation; | ) C. A. No.. _____ |
| **Oce North America, Inc.**, a Delaware corporation; | ) |
| **palmOne, Inc.**, a Delaware corporation; | ) |
| **Ricoh Corp.**, a Delaware corporation; | ) |
| **Riverdeep, Inc.**, a Delaware corporation; | ) **DEMAND FOR JURY TRIAL** |
| **Savin Corp.**, a Delaware corporation; | ) |
| **Thomson, Inc.**, a Delaware corporation; | ) |
| **Apple Computer, Inc.**, a California corporation; | ) |
| **Axis Comms., Inc.**, a Massachusetts corporation; | ) |
| **Canon USA, Inc.**, a New York corporation; | ) |
| **Eastman Kodak Co.**, a New Jersey corporation; | ) |
| **Fuji Photo Film USA**, a New York corporation; | ) |
| **Fujitsu Computer Products of America, Inc.**, | ) |
| a California corporation; | ) |
| **International Business Machines Corp.**, | ) |
| a New York corporation; | ) |
| **Jasc Software, Inc.**, a Minnesota corporation; | ) |
| **Toshiba America Consumer Products, LLC**, | ) |
| a New Jersey corporation; and | ) |
| **Xerox Corp.**, a New York corporation, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| **Compression Labs, Inc.**, a Delaware corporation; | ) |
| **Forgent Networks, Inc.**, a Delaware corporation; | ) |
| and **General Instrument Corp.**, a Delaware | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

C. A. No.. 0 4 - 8 1  -

## <u>COMPLAINT</u>

## NATURE OF THE ACTION

1.    This is an action against Compression Labs, Inc. ("CLI"), Forgent

Networks, Inc. ("Forgent") (collectively referred to herein as "CLI/Forgent"), and

General Instrument Corp. ("GI") (CLI, Forgent, and GI are collectively referred to herein

as "Defendants") seeking, among other relief, the following: (a) a declaratory judgment

that U.S. Patent No. 4,698,672 ("the '672 patent") (attached as Exhibit A) is not

infringed, is invalid and is unenforceable, in whole or in part, for the reasons alleged

below; (b) a declaratory judgment that certain Plaintiffs (identified below) have a direct

and/or implied license to the '672 patent; (c) a declaratory judgment that CLI/Forgent be

estopped from attempting to enforce the '672 patent; (d) damages and declaratory relief

under Delaware statutory and common law for CLI/Forgent's deceptive trade practices,

unfair competition, fraud, negligent misrepresentation, equitable estoppel and patent

misuse; and (e) relief under federal antitrust laws for CLI/Forgent's violations of Section

2 of the Sherman Act.

2.    This action arises out of CLI/Forgent's efforts to enforce an invalid,

unenforceable and non-infringed patent that CLI/Forgent alleges covers the international

standard adopted by the Joint Photographic Experts Group (the "JPEG Standard").

3.    The JPEG Standard was first adopted in September 1992, following years

of research and collaboration in the international standards community, which included

the International Standards Organization ("ISO"), the International Telegraph and

Telephone Consultative Committee ("CCITT") and the American National Standards

Institute ("ANSI").

4.    The JPEG Standard defines an international standard for compression,

decompression, transmission and storage of digital still images—anything from

photographs to documents to graphics. The JPEG Standard permits users to store and

share digital still images among products from various manufacturers without concern

over compatibility. Products that incorporate the JPEG Standard include a wide variety

of hardware devices or software applications such as personal computers, personal digital

assistants, digital cameras, digital camcorders, cellular telephones, Internet browsers,

document or photo viewers, editing software, printers, scanners, fax machines and the

like. The most common representation of the JPEG Standard is the ".jpg" file extension

used on computers and related devices to store photographs and other digital still images.

     5.     CLI/Forgent has been and is attempting unlawfully to subvert the JPEG

Standard and to extract hundreds of millions of dollars in unwarranted profits based on

consumers' long reliance on the JPEG Standard through their purchases of JPEG-enabled

products. Now that industries and their customers have adopted and become dependent

on the JPEG Standard, CLI/Forgent is attempting to assert the '672 patent against the

standard, insisting that the '672 patent covers technology embodied in and essential to

practicing the JPEG Standard.

     6.     In recent months, CLI/Forgent has begun a campaign of threats, litigation

and other tactics designed to cause doubt and uncertainty and ultimately to exclude others

from freely practicing the JPEG Standard. CLI/Forgent intends to force manufacturers to

make unwarranted licensing payments to CLI/Forgent, thus elevating the market price of

JPEG-enabled products and denying producers and users of JPEG-enabled products the

benefits and efficiencies of an open, ubiquitous standard. CLI recently sued more than 30

companies that refused to capitulate to its licensing demands, wrongfully alleging that the

practice of the JPEG Standard infringes the '672 patent.

7.      CLI/Forgent's campaign to enforce the '672 patent stems from a history of deception, delay and anticompetitive behavior. CLI's unlawful conduct is highlighted, in part, by the following:

i)      CLI intentionally failed to disclose known, material prior art to the United States Patent and Trademark Office (the "Patent Office");

ii)     CLI engaged in a pattern of misleading silence and misrepresentations about the purported relevance of the '672 patent to the development of the JPEG Standard, despite a clear duty to disclose its relevant patents while voting to approve the JPEG Standard and otherwise participating in JPEG-related standard-setting activities;

iii)    CLI/Forgent unreasonably and inexcusably delayed in notifying Plaintiffs of their alleged infringement; and

iv)     CLI/Forgent committed deceptive, misleading and exclusionary conduct that threatens to create anticompetitive market power over the JPEG Standard by acquiring and maintaining control over the technology in the JPEG Standard that companies have incorporated into their products, despite the knowledge that: (a) the '672 patent is not infringed, is invalid and is unenforceable; (b) the '672 patent was obtained through fraud on the Patent Office by failing to disclose anticipatory prior art; and (c) CLI failed to disclose the purported applicability of the '672 patent to the standard-setting community, despite a clear duty to do so, during its participation in the adoption of the JPEG Standard.

I.    **THE PARTIES**

A.    <u>**The Plaintiffs—Industry Leaders and Users of the JPEG Standard.**</u>

8.    Each of the Plaintiffs identified below manufactures and/or sells products that incorporate JPEG algorithms and are designed to be compliant with the JPEG Standard.  Plaintiffs are consumers of the technology incorporated in the JPEG Standard, including the technology that CLI/Forgent unlawfully and fraudulently maintains infringes CLI's invalid and unenforceable patent.  Plaintiffs develop, manufacture and/or sell a wide variety of digital imaging products, including computers, digital imaging and storage systems, software with photo editing and/or viewing functions, digital cameras, digital scanners and printers.  Employees of several Plaintiffs participated in the creation and adoption of the JPEG Standard.

9.    Plaintiff Agfa Corp. ("Agfa") is a corporation organized and existing under the laws of Delaware.  Agfa's principal place of business is in Ridgefield Park, New Jersey.

10.    Plaintiff Dell Inc. ("Dell") is a corporation organized and existing under the laws of Delaware.  Dell's principal place of business is in Round Rock, Texas.

11.    Plaintiff Gateway, Inc. ("Gateway") is a corporation organized and existing under the laws of Delaware.  Gateway's principal place of business is in Poway, California.

12.    Plaintiff Hewlett-Packard Company ("HP") is a corporation organized and existing under the laws of Delaware.  HP's principal place of business is in Palo Alto, California.

13.     Plaintiff JVC Americas Corp. ("JVC Americas") is a corporation organized and existing under the laws of Delaware.  JVC Americas' principal place of business is in Wayne, New Jersey.

14.     Plaintiff Macromedia, Inc. ("Macromedia") is a corporation organized and existing under the laws of Delaware.  Macromedia's principal place of business is in San Francisco, California.

15.     Plaintiff Matsushita Electric Corporation of America ("Matsushita America") is a corporation organized and existing under the laws of Delaware. Matsushita America's principal place of business is in Secaucus, New Jersey.

16.     Plaintiff Mitsubishi Digital Electronics America, Inc. ("Mitsubishi America") is a corporation organized and existing under the laws of Delaware. Mitsubishi America's principal place of business is in Irvine, California.

17.     Plaintiff Oce North America, Inc. ("Oce") is a corporation organized and existing under the laws of Delaware.  Oce's principal place of business is in Chicago, Illinois.

18.     Plaintiff palmOne, Inc. ("palmOne") is a corporation organized and existing under the laws of Delaware.  palmOne's principal place of business is in Milpitas, California.

19.     Plaintiff Ricoh Corp. ("Ricoh") is a corporation organized and existing under the laws of Delaware.  Ricoh's principal place of business is in West Caldwell, New Jersey.

20.     Plaintiff Riverdeep, Inc. ("Riverdeep") is a corporation organized and existing under the laws of Delaware. Riverdeep's principal place of business is in Novato, California.

21.     Plaintiff Savin Corp. ("Savin") is a corporation organized and existing under the laws of Delaware. Savin's principal place of business is in Stamford, Connecticut.

22.     Plaintiff Thomson, Incorporated ("Thomson") is a corporation organized and existing under the laws of Delaware. Thomson's principal place of business is in Indianapolis, Indiana.

23.     Plaintiff Apple Computer, Inc. ("Apple") is a corporation organized and existing under the laws of California. Apple's principal place of business is in Cupertino, California.

24.     Plaintiff Axis Communications, Inc. ("Axis") is a corporation organized and existing under the laws of Massachusetts. Axis's principal place of business is in Chelmsford, Massachusetts.

25.     Plaintiff Canon USA, Inc. ("Canon USA") is a corporation organized and existing under the laws of New York. Canon USA's principal place of business is in Lake Success, New York.

26.     Plaintiff Eastman Kodak Company ("Kodak") is a corporation organized and existing under the laws of New Jersey. Kodak's principal place of business is in Rochester, New York.

27.    Plaintiff Fuji Photo Film USA ("Fuji USA") is a corporation organized and existing under the laws of New York. Fuji USA's principal place of business is in Valhalla, New York.

28.    Plaintiff Fujitsu Computer Products of America, Inc. ("FCPA") is a corporation organized and existing under the laws of California. FCPA's principal place of business is in San Jose, California.

29.    Plaintiff International Business Machines Corporation ("IBM") is a corporation organized and existing under the laws of New York. IBM's principal place of business is in Armonk, New York.

30.    Plaintiff Jasc Software, Inc. ("Jasc") is a corporation organized and existing under the laws of Minnesota. Jasc's principal place of business is in Eden Prairie, Minnesota.

31.    Plaintiff Toshiba America Consumer Products, LLC ("TACP") is a corporation organized and existing under the laws of New Jersey. TACP's principal place of business is in Wayne, New Jersey.

32.    Plaintiff Xerox Corporation ("Xerox") is a corporation organized and existing under the laws of New York. Xerox's principal place of business is in Stamford, Connecticut.

**B.    The Defendants.**

33.    Defendant CLI, a corporation organized and existing under the laws of Delaware, is a wholly-owned subsidiary of Defendant Forgent. On information and belief, CLI has no principal place of business and currently engages in no operations other than the licensing of one or more patents through attorneys controlled by Forgent. CLI claims to be a co-owner of the '672 patent. CLI asserts, both directly and through

Forgent, that no one may make, offer to sell, sell or use JPEG-enabled devices in the United States without a license to the '672 patent from CLI/Forgent. In two lawsuits filed in the Eastern District of Texas, Marshall Division, styled *Compression Laboratories, Inc. v. Agfa Corp., et al.,* C.A. No. 2-04-CV-158 and *Compression Laboratories, Inc. v. Dell Inc., et al.,* C.A. No. 2-04-CV-159, CLI has sued Plaintiffs and other parties for allegedly infringing the '672 patent by making, using, offering to sell, or selling JPEG-enabled products.

34.    Defendant Forgent is a corporation organized and existing under the laws of Delaware. Forgent's principal place of business is at 108 Wild Basin Drive, Austin, Texas. Forgent's stock is publicly traded on the Nasdaq stock exchange (Stock Symbol: FORG). Forgent claims its patent licensing program is focused on generating license revenues relating to Forgent's data compression technology, which consists primarily, if not exclusively, of the fraudulently-obtained '672 patent. Forgent has been and is asserting the '672 patent in licensing and litigation through its wholly-owned subsidiary, CLI.

35.    Defendant GI is a corporation organized and existing under the laws of Delaware. On information and belief, GI does business as the Broadband Communications Sector of Motorola, Inc. and maintains its principal place of business at 101 Tournament Drive, Horsham, Pennsylvania. GI is an owner of an undivided one-half interest in the '672 patent.

36.    With respect to all or part of the conduct alleged herein, Defendants CLI and Forgent acted as one another's alter egos and/or agents. To that extent, CLI and

Forgent are jointly and severally liable for the damages and other harm that either of them caused to Plaintiffs.

## II.    JURISDICTION AND VENUE

37.    This action arises under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, the United States patent and antitrust laws, and the laws of Delaware. An actual, substantial and continuing justiciable controversy exists between Plaintiffs and Defendants that requires a declaration of rights by this Court.

38.    The Court has subject matter jurisdiction over these claims under 28 U.S.C. §§ 1331, 1337 and 1338, as well as 15 U.S.C. §§ 4, 15, 16 and 26. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

39.    The Court has personal jurisdiction over Defendants by virtue of, among other things, Defendants' respective incorporations in Delaware.

40.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400, as well as 15 U.S.C. §§ 15 and 22.

41.    Plaintiffs and Defendants are engaged in, and Defendants' conduct described herein took place in and affects, interstate commerce within the meaning of Title 15.

## III.    BACKGROUND OF DEFENDANTS' UNLAWFUL CONDUCT

### A.    CLI Defrauded the Patent Office in Obtaining the '672 Patent.

42.    On October 27, 1986, CLI filed with the Patent Office an application (serial number 06/923,630) ("the '630 application") that ultimately issued as the '672 patent on October 6, 1987. The '630 application named Wen-hsiung Chen ("Chen") and Daniel J. Klenke ("Klenke") as the inventors. Chen and Klenke, then CLI employees, assigned their rights to CLI. The '630 application, authorized by at least CLI's Vice

President James M. Walker ("Walker"), was accompanied by a power of attorney

appointing David E. Lovejoy ("Lovejoy") and the attorneys of Fliesler, Dubb, Meyer &

Lovejoy as authorized agents to prosecute the application.

43.    When filing the '630 application, Chen and Klenke submitted to the Patent

Office a declaration under penalty of perjury attesting that they were the original, first

and joint inventors of the subject matter claimed in the '630 application.  On behalf of

themselves and CLI, they acknowledged in their declaration a duty to disclose to the

Patent Office information material to the examination of the '630 application under 37

C.F.R. § 1.56 ("Patent Rule 56").

44.    Under Patent Rule 56, at all relevant times relating to the '630 application,

a duty of candor and good faith toward the Patent Office rested on at least the following

individuals: (i) Chen and Klenke; (ii) every attorney or agent who prepared or prosecuted

the '630 application, including Lovejoy and others at his law firm involved in the '630

application; and (iii) every other individual associated with Chen, Klenke, or CLI that

was substantively involved in the preparation or prosecution of the '630 application.

Patent Rule 56 further mandated that all such individuals had a duty to disclose to the

Patent Office any information they were aware of that was material to the examination of

the '630 application.  Patent Rule 56 specified that information was material if there was

"a substantial likelihood that a reasonable examiner would consider it important in

deciding whether to allow the application to issue as a patent."

45.    Despite their duty of candor and good faith, individuals employed by CLI

intentionally withheld material information from the Patent Office during the pendency

of the '630 application.  The information withheld was material and, had the examiner

been aware of the information at any time before issuance of the '672 patent, the patent would not have issued or, at the very least, would have issued with a substantially different scope. From these circumstances, including the high degree of materiality, the decision not to disclose the information to the Patent Office was, on information and belief, made with the intent to defraud and/or deceive the Patent Office into issuing the '672 patent.

46.    Prior to the issuance of the '672 patent, CLI and others substantively involved in the preparation and prosecution of the '672 patent were in possession of the following material information:  (i) the prior public use of the technology at issue in the '630 application by a company called Widcom more than a year before the October 27, 1986 filing date of the patent application; (ii) the prior commercial sale of the technology at issue in the '630 application, as incorporated into a videoconferencing codec (short for "coder/decoder") manufactured and sold by Widcom, called the Widcom VTC-56, more than a year before the October 27, 1986 filing date of the application; and (iii) information about Widcom and the Widcom VTC-56 demonstrating that the invention sought for patenting was known or used by others in the United States before the time of the claimed invention thereof by Chen and Klenke.

47.    The Widcom VTC-56 anticipates the claims of the '672 patent. CLI and others involved in the application for the '672 patent knew the details of the Widcom VTC-56 from a close and adversarial relationship with Widcom.

48.    As alleged below, over several years preceding the '630 application that gave rise to the '672 patent, CLI and Widcom were engaged in extensive litigation substantially relating to Widcom's commercialization of the Widcom VTC-56.  CLI

ultimately defeated Widcom through its various lawsuits and purchased in bankruptcy the

rights, assets and technologies relating to the Widcom VTC-56. CLI took full legal title

to the assets and important documents relating to the Widcom VTC-56 before the '672

patent issued. Despite CLI's extensive knowledge of the Widcom VTC-56 obtained as a

result of the litigation with Widcom and acquisition of the Widcom VTC-56 device,

neither CLI nor anyone else responsible for the '630 application disclosed the prior sales

of the Widcom VTC-56 or other related invalidating prior art to the Patent Office.

**1.    CLI Learns Detailed Information About the Widcom VTC-56 Prior Art in Trade Secret Litigation Against Widcom.**

49.    CLI was first incorporated in California in December 1976. In late 1979,

a former principal of CLI left CLI to start another company, called Widergren Associates.

Other CLI employees later became employed by Widergren Associates. Widergren

Associates was incorporated in 1983 and renamed Widergren Communications

("Widcom").

50.    On or about June 4, 1981, CLI filed a lawsuit in the Superior Court of the

State of California, County of Santa Clara, Case No. 476629, against Widcom and

several of its employees alleging, among other things, trade secret misappropriation. The

trade secret lawsuit charged that Widcom and the other defendants misappropriated

certain CLI proprietary information relating to the compression of data associated with

video and other signals. The lawsuit focused on Widcom's development of a prototype

video data compression system for Bell & Howell. On information and belief, the Bell &

Howell prototype was a 256 Kbps video compressor and the Widcom VTC-56's

predecessor.

51.     On or before March 23, 1983, while the trade secret lawsuit was pending, Widcom was awarded a contract by the Defense Advanced Research Projects Agency ("DARPA"), an agency of the U.S. Department of Defense, to produce a prototype 56 Kbps video conferencing codec.  On information and belief, Widcom successfully developed and delivered to DARPA at least five 56 Kbps video conferencing codecs, together with various reports and test results, on or before the conclusion of the contract. On information and belief, the 56 Kbps codec developed and delivered under the DARPA contract was thereafter commercially marketed and sold by Widcom as the Widcom VTC-56.

52.     On or about May 23, 1983, CLI and Widcom entered into a settlement agreement relating to the trade secret lawsuit.  That same day, the court entered an Order for Permanent Injunction Pursuant to Stipulation ("Permanent Injunction").  Under the terms of the settlement and Permanent Injunction, Widcom agreed to disclose to CLI (as assignee of Widcom's Bell & Howell contract) "any and all inventions made by or on behalf of Widcom as a direct result of the work performed" under the Bell & Howell contract.

53.     On information and belief, as a result of the litigation, including the disclosures required by the Permanent Injunction, CLI became aware of the details of the Widcom VTC-56.

**2.     As Widcom Continues to Commercialize the Widcom VTC-56, CLI Initiates Further Litigation Against Widcom.**

54.     After the settlement of the trade secret lawsuit, Widcom entered into a series of agreements to sell and/or distribute the Widcom VTC-56, including agreements

with Comsat General Corp. (dated June 1983), Vitalink Corp. (dated July 1983) and Pierce Phelps, Inc. (dated November 1983).

55.    Widcom's development and commercialization of the Widcom VTC-56 was publicized in 1983 and 1984 on at least the following occasions:

i)    In November 1983, *Electronics* magazine reported that the Widcom VTC-56 was being given to the U.S. Navy for testing.

ii)    In November 1983, PR Newswire reported that Widcom's "shipment of its new video conferencing codec…will begin in early spring of 1984. Initial production models will be available by the end of January 1984."

iii)    In January 1984, several Widcom employees authored an article published in *Electronics* entitled "Codec squeezes color teleconferencing though digital telephone lines," which focused on the Widcom VTC-56.

iv)    In May 1984, *Computerworld* magazine publicized the availability of the Widcom VTC-56, describing it as a "coder-decoder (that) allows transmission of color TV pictures via a 56 kbits telephone or satellite link."

v)    In June 1984, *MIS Week* magazine reported the introduction of Widcom's VTC-56 codec.

vi)    In August 1984, *Electronic Imaging* magazine reported that Widcom displayed its VTC-56 coder-decoder at the International Communications Association's annual meeting in Las Vegas, Nevada.

56.    On information and belief, Widcom's commercialization of the Widcom VTC-56 prompted CLI to take further legal action against Widcom.  In or about September 1984, CLI successfully petitioned the Santa Clara County Superior Court to

appoint Dr. Harry Jones as Special Master "to review the activities of defendants in the development, manufacture, sale or license of video data compression devices." The Special Master was directed to submit a report to the Court regarding whether Widcom was in compliance with the May 1983 Permanent Injunction.

57.     The Special Master released his report in November 1985, but in the intervening months Widcom continued to publicize, market and sell the Widcom VTC-56, including:

      i)     In September 1984, Widcom published its SEC Form 10-K for the fiscal year ending June 30, 1984, which stated in part:

> In March 1983, the Company entered into a contract with the Defense Advance Research Projects Agency (DARPA), an agency of the United States Department of Defense, to produce one prototype video teleconferencing codec. This contract was completed early in 1984 and eight units of the resulting product, the VTC-56, were shipped in June 1984.

      ii)     In October 1984, Widcom announced its new motion color system, called the PVS (Personal Videoconferencing Station), stating: "When used in conjunction with Widcom's VTC-56 coder/decoder, users may telephone across the country or around the world using one of several common carriers with video transmitted and received at 56 kbps over digital phone lines or satellite links."

      iii)     That same month, Widcom received a "Teleconferencing Award" at the Third Annual Teleconference Magazine Awards Dinner (TeleCon IV) for its "Development of the Widcom 56 kbps Codec."

      iv)     In May 1985, Widcom signed a distribution agreement with Telefonbau und Normalzeit GmbH ("Telenorma"), whereby Telenorma ordered three Widcom VTC-56s for testing and registration with the German government.

v)    In June 1985, Widcom signed a distribution agreement with Jeumont-Schneider, whereby Jeumont-Schneider ordered two VTC-56s for experimentation and approval by the French Administration. That same month, Widcom also signed a distribution agreement with Mitsui & Co., Ltd. that included an initial purchase of four Widcom VTC-56s.

vi)    In September 1985, Widcom published its SEC Form 10-K for the fiscal year ending June 30, 1985, reporting that it had shipped 57 Widcom VTC-56s. Widcom also announced it had introduced in August 1985 its next-generation codec, the VTC-56B.

vii)    In November 1985, DARPA issued a report titled "Design, Development and Installation of a two-node, color video teleconferencing system for the U.S. Navy," which described the Widcom VTC-56 as "the heart of the Navy Video-Teleconferencing System." The report states that the Widcom VTC-56 went into operation in August 1985.

58.    In November 1985, Special Master Jones issued his Report concerning Widcom's compliance with the May 1983 Permanent Injunction. The Report concluded that Widcom should be held in contempt of court because: (a) Widcom had signed 14 licensing, sales, distribution and development contracts between February 1982 and June 1985; and (b) Widcom provided information on the VTC-56 to the public and to customers, including a March 1983 DARPA Algorithm Report, a 1984 Widcom VTC-56 Manual, and a collection of articles written and lectures given by Widcom employees from 1983 to 1985.

### 3.    Details of the Widcom VTC-56 Are Shared with CLI's Employees and Directors.

59.    On or about December 2, 1985, CLI successfully petitioned the Santa Clara Superior Court to modify the protective order in the trade secret lawsuit to allow the Special Master Report to be distributed to "CLI employees and directors." According to CLI's 1985 SEC filings, its directors at the time included John E. Tyson, James M. Walker, Arthur G. Anderson, Thomas J. Davis, Jr., John R. Dougery, Robert E. Schroeder and David A. Wegman.

### 4.    CLI Sues Widcom for Patent Infringement Over the Widcom VTC-56, in Which CLI Acknowledges Widcom's Commercialization of the VTC-56.

60.    In December 1985, CLI filed a patent infringement lawsuit against Widcom in the United States District Court for Northern District of California (the "Widcom Patent Suit"). The Widcom Patent Suit did not involve the '672 patent (the application for which had not yet been filed), but rather CLI alleged that Widcom infringed two related patents. The Widcom Patent Suit, which focused primarily on the Widcom VTC-56, claimed that Widcom had: (a) "commenced manufacture" of the Widcom VTC-56; (b) "marketed and distributed" the Widcom VTC-56; and (c) entered into distribution or resale agreements with at least five distributors relating to the Widcom VTC-56. CLI was represented in the Patent Suit by, among others, David Lovejoy of Fliesler, Dubb, Meyer & Lovejoy.

61.    In June 1986, Widcom filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California (Case No. 586-02619-M). In August 1986, CLI Vice President of Finance, James M. Walker, submitted a Proof of Claim on behalf of CLI in the Widcom bankruptcy proceeding. In its Proof of

Claim, CLI stated it was a claimant of Widcom in excess of $1 million because of the pending Widcom Patent Suit.

### 5. CLI Files the '630 Application But Fails to Disclose the Widcom VTC-56 Prior Art.

62.     On October 27, 1986, while the Widcom Patent Suit was pending, Chen and Klenke filed the '630 application in the Patent Office. As alleged above, the Power of Attorney filed with the '630 application appointed Lovejoy as the patent lawyer authorized to prosecute the '630 application—the same lawyer who was listed as counsel of record for CLI in the Patent Suit involving the Widcom VTC-56. The Power of Attorney was executed for CLI by Walker, who had previously executed the Proof of Claim in the Widcom bankruptcy proceeding. On information and belief, as a director of CLI, Walker also had knowledge of the Special Master Report discussing the Widcom VTC-56.

63.     According to the prosecution history of the '672 patent, neither the inventors nor CLI's patent attorneys ever disclosed any prior art to the Patent Office during the prosecution of the '630 application. Each of the five references cited on the face of the '672 patent were discovered by the patent examiner. There was never any disclosure relating to the Widcom VTC-56, a device that anticipates, or at the very least makes obvious, the claims of the '672 patent and, on information and belief, was known in detail by CLI and those substantively involved in the prosecution of the '630 application.

### 6. While the '630 Application Is Pending, CLI Purchases Widcom's Assets Relating to the Widcom VTC-56 in Bankruptcy.

64.     On or about June 23, 1987, the Patent Office issued a Notice of Allowance for the filed claims of the '630 application. Lovejoy mailed the issue fee for the '672

patent to the Patent Office on or about July 9, 1987. On or about July 10, 1987, CLI

published a press release announcing the settlement of the Patent Suit. CLI's press

release explained that Widcom had agreed to transfer to CLI technology related to the

Widcom VTC-56:

> Following commencement of CLI's lawsuit in December
> 1985, Widcom filed for protection from creditors in the
> U.S. Bankruptcy Court on June 6, 1986. In June 1987, a
> trustee was appointed by the Bankruptcy Court to explore
> the possible sale of Widcom's remaining assets. Under the
> settlement agreement, which was negotiated with the
> Widcom trustee and approved by the Bankruptcy Court on
> July 8, Widcom acknowledged the validity of the two CLI
> patents, as well as Widcom's infringement of them in its
> manufacture and sale of its VTC-56 videoconferencing
> codec and its RAPICS 500 data compression device.
> Widcom further agrees to the entry of a stipulated judgment
> against it by the U.S. District Court on CLI's patent
> infringement claims, and the issuance of a permanent
> injunction restraining Widcom from further infringement of
> CLI's patents. As part of the agreement reached with CLI,
> Widcom will transfer to CLI full title to all of Widcom's
> video and data compression technology, including its
> interest in a manufacturing license previously granted by
> Widcom to a German distributor of its VTC-56 product,
> Telefonau und Normalzeit, GmbH. CLI, in turn, has
> agreed to purchase from the trustee Widcom's remaining
> inventory of video and data compression devices, including
> its existing stock of VTC-56 codecs, RAPICS 500, DCU
> 192 units and all spares and parts for $150,000. As part of
> the settlement, CLI has agreed not to sue those former
> Widcom customers who purchased VTC-56 codecs prior to
> the court settlement for infringement of CLI's patents.
> (Emphasis added.)

65.     On or about July 13, 1987, the bankruptcy court entered an Order

Authorizing and Approving Sale of Assets to Compression Labs, Inc. and Settlement

Agreement ("Asset Sale Order") that transferred to CLI all of Widcom's

> right, title and interest in and to any invention, know-how,
> or other technology relating to the compression of data for
> storage or transmission, including, without limitation,

> [Widcom's] existing inventory of VTC-56 codecs ... and
> all engineering drawings or documentation relating to any
> of the above products.

66.    On information and belief, through the litigation of the Widcom Patent

Suit and the Asset Sale Order, CLI and those substantively involved in the prosecution of

the '630 application came into possession of all engineering drawings and documentation

related to the Widcom VTC-56.  At or about this time, CLI also came into possession of

Widcom's existing inventory of Widcom VTC-56s.

67.    On or about July 17, 1987, CLI and Widcom submitted to the Court a

Stipulation for Entry of Judgment and Order of Permanent Injunction ("Judgment") in the

Widcom Patent Suit.  The Judgment attached as an exhibit the Asset Sale Order from the

bankruptcy proceedings.  This fact further demonstrates that Lovejoy was aware of the

Widcom VTC-56 before the '672 patent issued.

68.    Based on the foregoing, during the pendency of the '630 application, the

persons substantively involved in prosecuting the '630 application, including Lovejoy

and Walker, were aware of the existence, capabilities and materiality of the Widcom

VTC-56 and of other material prior art obtained from Widcom.  Despite such knowledge,

those persons acting on behalf of CLI failed to disclose the Widcom VTC-56 or other

prior art to the Patent Office in violation of the patent statutes and their duty of candor

under Patent Rule 56.  On information and belief, CLI and its agents made a conscious

decision to violate their clear obligations by intentionally concealing this material

information so as to defraud the Patent Office.  As a consequence, CLI's application for

the '672 patent issued on October 6, 1987.  On information and belief, had the patent

examiner been made aware of the material information possessed by CLI and its agents,

the '672 patent would not have issued or, at the very least, would have issued with a substantially different scope.

**B.     CLI Deceived the International Standard-Setting Community and Its Members During Development and Approval of the JPEG Standard.**

69.     Before, during and after fraudulently obtaining the '672 patent, CLI participated as a member of several committees that developed and adopted the JPEG Standard. Having participated in the JPEG standard-setting process and having voted to approve the JPEG Standard, CLI had a legal duty to disclose the purported applicability of the '672 patent that it now claims (more than a decade later) covers essential technology embodied in the JPEG Standard. As alleged below, CLI violated its legal duty. During its participation in and approval of the JPEG Standard, CLI engaged in a pattern of deceptive silence and misleading statements on which Plaintiffs reasonably relied to their material detriment in supporting the approval of the JPEG Standard and thereafter incorporating the JPEG Standard into their products.

**1.     CLI Knew About Its Disclosure Obligations Through Its Participation in the JPEG Committee and Related Standard-Setting Committees.**

70.     The JPEG Standard was first adopted and published in 1992 after years of international effort by several standard-setting organizations, including ISO, CCITT and ANSI.

71.     Efforts to develop the JPEG Standard began in or about September 1982 when Working Group 8 of the ISO ("ISO Working Group 8") was established and assigned the task of identifying picture coding mechanisms and encoding principles for graphic and photographic images. Soon thereafter, a subgroup of ISO Working Group 8 known as the "Photographic Experts Group" (or "PEG") began analyzing options for standardizing a compression technique for still images.

72.    In or about November 1984, while the JPEG Standard was developing within ISO Working Group 8, CLI was actively participating in and contributing to a related video compression standard as a member of CCITT Study Group XV. During this time, CLI participated in the development of CCITT Recommendation H.261 (a video teleconferencing standard generally thought to be the precursor to the MPEG video compression standard) and later in the development of the ISO MPEG standard.

73.    On or about November 11, 1986, just two weeks after CLI filed the '630 application that led to the '672 patent, ISO Working Group 8 and a subgroup of CCITT Study Group VIII (focused on still image compression) held their first combined meeting in Parsippany, New Jersey. Through this collaboration, the "PEG" subgroup of ISO Working Group 8 evolved into the Joint Photographic Experts Group, or JPEG. At this meeting, it was announced that CCITT Study Group XV—in which CLI was an active participant—would be told about the JPEG committee's work. Soon thereafter, the JPEG committee expanded its coordination efforts to include ANSI Task Group X3L2.1 (later renamed X3L2.8) (hereafter the "ANSI Task Group") when the ANSI Task Group sent a memorandum to ISO Working Group 8 stating that the ANSI Task Group had decided to have representation in the JPEG committee "and to adopt the international standard developed in [Working Group 8] as an ANSI standard."

74.    In November 1986, CLI announced to the CCITT Study Group XV video compression committee that it had patents that "may apply" to its work on the video compression standard. CLI stated it "would entertain limited field of use licensing" and promised it would "strive to provide a flexible and nondiscriminatory solution so the proposed standard can be implemented." Thereafter, as alleged below, CLI repeatedly

disclosed its belief that the '672 patent applied to the emerging video compression standard. CLI, however, never intimated a belief that the '672 patent had any relevance to the JPEG Standard, despite CLI's knowledge of the details of the standard and its obligation to make such a disclosure.

75.    In June 1987, at a JPEG meeting in Copenhagen, the JPEG committee considered ten compression techniques (out of an original twelve proposals) vying to become part of the JPEG Standard. From this original group, the JPEG committee chose three finalists: (1) Adaptive Discrete Cosine Transform ("ADCT"), proposed by a group called ESPRIT; (2) Adaptive Binary Arithmetic Coding ("ABAC"), proposed by IBM; and (3) Generalized Block Truncated Coding ("GBTC"), a proposal from the Japanese national body. ADCT eventually won the competition and became the baseline for the JPEG Standard. The ABAC technology was selected for an extended function of the JPEG Standard, but is not required for use in the baseline JPEG Standard. However, the ABAC technology or any one of several alternative technologies were acceptable and readily-available substitutes for the ADCT technology included in the baseline JPEG Standard. Had CLI made its purported patent interests known at any time during the development of the JPEG Standard, the JPEG committee could have substituted the ADCT technology with any one of these acceptable and available alternatives.

76.    On information and belief, as early as November 1987, the CCITT Study Group XV video compression committee—in which CLI was an active participant—was aware of the details of the technology proposed for inclusion in the JPEG Standard, including the redundancy coding model for the ADCT technology.

77.    In December 1987, CLI notified the CCITT Study Group XV video

compression committee of the '672 patent by making the following statement:

> Current knowledge of the coding techniques being
> recommended for CCITT Nx384 codec leads us to believe
> that this technology is covered in part by our Patent.  If
> such is the case, Compression Labs hereby states its
> willingness to grant license on a non-discriminatory basis
> on reasonable terms if this technology becomes part of a
> CCITT recommendation, provided that other companies
> with applicable inventions reciprocate.

On information and belief, this disclosure did not address any purported relevance of the

'672 patent to the redundancy coding aspects of the ADCT technology.  CLI did not at

this time or at any other time say anything about any purported relevance of the '672

patent to the redundancy coding aspects of the ADCT technology that the JPEG

committee had disclosed to the CCITT Study Group XV video compression committee.

78.    Later that month, CLI sent another letter to the Study Group XV video

compression committee stating CLI's belief that the '672 patent "is pertinent to the

upcoming recommendations by CCITT on Nx384 video codecs."  CLI again agreed to

license the '672 patent "on reasonable terms worldwide."  On information and belief, CLI

again said nothing about any purported relevance of the '672 patent to the redundancy

coding in the ADCT technology that had been disclosed by the JPEG committee.

79.    In January 1988, during a CCITT Study Group XV video compression

committee meeting attended by two CLI employees, the committee discussed CLI's

disclosure of the '672 patent.  The meeting report states that "a U.S. patent of

Compression Labs, Inc. which may be relevant to two-dimensional VLC [Variable Word-

Length Coding] was informed to the Group."  At this meeting, the Study Group XV

video compression committee agreed to the JPEG committee's request for coordination

between the two developing standards (the H.261 video compression and JPEG still

image compression standard).  On information and belief, CLI again said nothing about

any purported relevance of the '672 patent to the redundancy coding in the ADCT

technology that had been disclosed to CCITT Study Group XV by the JPEG committee,

even though Study Group XV recommended that the JPEG committee use that

technology in the JPEG Standard.

80.    In May 1988, during a JPEG meeting in Ottawa, Canada, a memorandum

from Hiroshi Yasuda was distributed.  The Yasuda memorandum attached a list of

patents that had been disclosed to the Study Group XV video compression committee,

which included the '672 patent.  The memorandum stated:

> As we approach to the goal, patents relevant to the [JPEG]
> standard will affect very much.  Attached CCITT [MPEG]
> document is their results on patent search concerning DCT
> coding which is great help for us.  We would like to make
> great efforts to find out relevant patents, and if one or more
> such patents will be found, we would like to ask patent
> holders to declare to be obedient to the patent policy of ISO
> and CCITT.

This memorandum highlights JPEG committee members' effort, throughout the

development and adoption of the JPEG Standard, to adopt a royalty-free baseline

standard.

81.    In May 1988, Greg Wallace, the chairman of the JPEG committee,

distributed a memorandum entitled "Patent Issues: ADCT and ISO in General."  This

memorandum describes Mr. Wallace's work with a "prominent Boston law firm" to

determine whether there might be patents that could be infringed by the ADCT

technology sought to be included in the JPEG Standard.  Mr. Wallace explained that, of

the patents reviewed so far, "all that I have found to date have been for motion image

coding." His memorandum concludes: "As of this writing, I've not found any patent which appears to cover the ADCT."

82.    In or about February 1989, in response to ongoing concern about patents that might affect the JPEG Standard, the JPEG committee approved and published to ISO Working Group 8 and CCITT Study Group VIII committees a call for patents that might apply to any proposed parts of the JPEG Standard. Several JPEG committee members responded to this call to identify patents, including IBM, DEC, Mitsubishi, NEC, CCETT, SAT and Kodak. On information and belief, CLI did not respond, even though it had participated in ISO Working Group 8 plenary meetings.

83. ·   In or about January 1990, the JPEG committee completed an initial draft of the JPEG Standard and forwarded it to the ANSI Task Group for comment. The next month, CLI applied to participate in the ANSI Task Group. In June 1990, CLI employee Jonathan Zingman attended an ANSI Task Group meeting in Salt Lake City, at which time CLI became a full member of the ANSI Task Group.

84.    In July 1990, during an ISO Working Group 8 Plenary meeting in Porto, Portugal, the JPEG committee reported that final drafting of the JPEG Committee Draft (often called a "CD") would be finished by the end of October 1990. On information and belief, CLI employee Zingman attended the Porto meeting and, consistent with CLI's pattern of misleading silence about the '672 patent's purported relevance to the JPEG Standard, again failed to disclose the '672 patent.

85.    In September 1990, CLI sent a letter to the ISO MPEG video compression committee stating that "upon adoption of the MPEG Standard by the ISO," CLI would grant licenses under the CLI Patents "on non-discriminatory, fair and reasonable terms to

all users solely for their use in complying with the Standard." On information and belief, CLI's disclosure to the ISO MPEG video compression committee demonstrates that CLI was aware of its disclosure and licensing obligations under ISO's rules. CLI's failure to make the same disclosure to the JPEG committee demonstrates a pattern of intentional, misleading silence about the purported relevance of the '672 patent to the JPEG Standard.

    **2.    Despite Clear Knowledge of its Disclosure Obligations, CLI Sat in Silence as JPEG Members Developed the JPEG Standard.**

    86.    In or about October 1990, CLI employee Zingman attended an ANSI Task Group meeting in Rochester, New York, at which several notable events took place:

    i)    IBM's Joan Mitchell gave an overview of the status of the developing JPEG Standard.

    ii)    While discussing the JPEG Committee Draft, one ANSI Task Group member, again, raised the committee's concern about undisclosed patents. In response, Mitchell asked the attendee to draft a patent resolution to be considered by the members.

    iii)    The ANSI Task Group decided that its members and interested parties would be requested to "disclose patents as applicable to the JPEG standard." It then voted unanimously to approve a resolution that members and interested parties identify patents and patent applications "which someone believes must be used for every implementation of any of the modes of operation" of the JPEG Standard.

    87.    On information and belief, despite CLI's attendance at this ANSI Task Group meeting, CLI maintained its pattern of misleading silence and failed to disclose the '672 patent to the ANSI Task Group. CLI's failure to disclose the '672 patent in the face of a committee request to disclose patents related to the developing JPEG Standard

further lulled ANSI and JPEG committee members into believing that CLI did not claim to have patent rights relevant to the JPEG Standard.

> **3.    CLI Voted to Approve the Developing JPEG Standard With Knowledge of Its Disclosure Obligations and Failed to Disclose the '672 Patent Despite Multiple Calls for Patent Disclosure.**

88.    On or about May 21, 1991, CLI employee Zingman completed and submitted an ANSI Task Group Letter Ballot, through which CLI voted to approve the JPEG Committee Draft "as presented," which meant that the standard should progress to the next stage of development, the Draft International Standard stage.  CLI "certified" its approval of the JPEG Committee Draft when Zingman signed and dated the ballot. Again, CLI said nothing about the purported relevance of the '672 patent to the JPEG Standard.  Portions of CLI's ballot appear below:

89.    On August 4, 1991, consistent with the JPEG committee's goal for developing a royalty-free standard, chairman Greg Wallace issued a memorandum to the JPEG committee in which he requested that JPEG committee participants again disclose relevant patents. His memorandum requested that JPEG committee participants again disclose "all patents which you believe, with reasonable likelihood, MUST be used in EVERY implementation (whether encoder or decoder) of any one or more of the 29 defined coding processes ..." in the JPEG Standard (emphasis in original). Wallace's memorandum requested each JPEG committee participant to identify all patents "that you know of, whether held by you, by another member of your company or organization, by any individual, company, or organization anywhere in the world." Several members responded to this call for patents, including Plaintiffs Mitsubishi, Kodak, IBM and Autograph, by disclosing purportedly relevant patents or confirming they knew of none. On information and belief, despite having voted to approve the JPEG Standard, CLI remained silent about the purported relevance of the '672 patent to the JPEG Standard.

90.    On or about August 19, 1991, Greg Wallace sent another memorandum to the JPEG committee, attaching a draft of a new annex to be added to the JPEG Standard—Annex L. Wallace's memorandum explained that "it has been widely requested that...all known patents which are believed to be required for implementation of any specified coding process, be listed in [the JPEG Standard], and that there be means to update this list whenever additional patents are identified." Wallace made the following proposal (the reference to "WG10" below refers to ISO Working Group 10, which was the official title of the ISO JPEG committee by this time):

> I propose that WG10 respond to these requests by adding an
> informative annex to 10918-1, and that WG10 update this annex
> whenever a version of 10918-1 is published, including CD, DIS,
> IS, and any revisions to these.  Also, if after IS publication,
> additional patents are identified, I propose that WG10 revise the
> IS to include the additional patents, by means of the ISO
> defect-reporting process.

Annex L was implemented as a mechanism to:  (a) ensure that all known patents that were potentially relevant to the JPEG Standard would be identified and listed for implementers of the standard to consider; and (b) to ensure that the patent holder for each so-listed patent had stated its "willingness to grant a license to an unlimited number of applicants throughout the world under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  On information and belief, CLI did not respond to the request for identification of patents for Annex L.  As a result, the '672 patent was never listed in Annex L.

91.    In August 1991, CLI employees attended a joint JPEG-MPEG meeting in Santa Clara, California, during which the JPEG committee approved and adopted the introductory language of Annex L as a part of the JPEG Standard.  On information and belief, CLI again failed to disclose the purported relevance of the '672 patent to the JPEG committee.

92.    In or about November 1991, during a CCITT Study Group XV video compression committee meeting in Geneva, the committee discussed a proposal to add a still-image compression component to Recommendation H.261.  The Geneva meeting report shows that the committee considered CLI's patent holdings on still-image compression.  The report states: "As regards to patent issues, it was announced by a delegate of USA that CLI does not hold any patent nor does it intend to acquire any...."

Because of the technical overlap between JPEG and the proposed still-image annex to

H.261, a reasonable participant in the standard-setting process could have concluded

from this statement that CLI did not hold patents relevant to still-image compression

technology. On information and belief, this statement, coupled with CLI's misleading

silence about the purported relevance of the '672 patent to the JPEG Standard, further

lulled JPEG participants into believing that CLI did not claim to have patents relevant to

the JPEG Standard.

      **4.    CLI Voted for Final Approval of the JPEG Standard Having Already Concluded—Incorrectly—that Its Patents Purportedly Covered Technology Included in the Standard.**

      93.    On information and belief, by 1992 CLI had studied its patents, including

the '672 patent, and had formed the belief that its patents purportedly covered the

redundancy coding technology included in the JPEG Standard. In its March 1992 SEC

Form 10-K Annual Report, CLI stated:

> An adaptation of <u>DCT technology</u>, which has been the
> basis of all CLI products since its inception, is the
> foundation of the H.261 industry standard, <u>as well as the</u>
> <u>evolving Joint Picture Experts Group ("JPEG")</u> and Motion
> Picture Experts Group ("MPEG") standards for
> multimedia/desktop applications.
>
> The Company holds seven U.S. patents relating to video
> compression. <u>The patents were issued in 1978 or later and</u>
> <u>cover CLI's scene-adaptive coding and DCT techniques.</u>
> (Emphasis added.)

Yet in May 1992, CLI cast a second ballot to approve the JPEG Standard, once again

failing to disclose the '672 patent. Ballot records show that CLI's Padmanabha Rao

voted to approve the JPEG Draft International Standard "as presented."

      94.    With ballot approval from CLI and other JPEG members, JPEG became

the widely-adopted international standard it is today. Published on September 18, 1992

by CCITT as Recommendation T.81, the JPEG Standard was also formally adopted as ISO/IEC International Standard 10918-1 on February 15, 1994. ANSI subsequently adopted the JPEG Standard on January 11, 1999. Annex L to the JPEG Standard does not identify the '672 patent.

95.    On information and belief, before the JPEG Standard had been approved, CLI had formed the incorrect belief that the '672 patent would be infringed by anyone practicing the standard. Nevertheless, throughout the entire period of CLI's participation in the JPEG standard-setting effort, CLI did not once answer the multiple calls for disclosure of patents relevant to the standard, choosing instead to keep its patent claims hidden from the JPEG committee. CLI's silence—even as it voted to approve the standard—misled and subverted the standard-setting process. The members of the JPEG standard-setting organizations relied on CLI's silence in voting to recommend the JPEG Standard, which was in turn incorporated by Plaintiffs and others into many products during the next 12 years.

**C.    CLI Deceived and Injured Plaintiffs by Delaying the Filing of Its Lawsuit.**

96.    On information and belief, no later than July 1990, CLI was aware of the JPEG Standard and the redundancy coding algorithms it contained.

97.    On information and belief, CLI received in July 1990 a report entitled "Enhancement of Draft Rec. H.221/H.242 for still picture transmission" through its participation in the CCITT Study Group XV video compression committee. This report included an Annex titled "Explanation of the JPEG coding algorithm specification" and also disclosed that "today there are already first prototypes for still picture transmission according to the JPEG specification on the market."

98.    On information and belief, by March 1992 CLI had incorrectly concluded that its patents, including the '672 patent, purportedly covered technology in the JPEG Standard.  CLI reported that belief in its SEC Form 10-K Annual Report, as alleged above.

99.    On information and belief, CLI was aware no later than 1990 that the JPEG Standard was being implemented in the market.  This is particularly evident from the well-attended and well-publicized Electronics Imaging '90 East Conference held in Boston, Massachusetts, in October 1990.  The conference included an afternoon dedicated to JPEG.  The event was chaired by IBM's Joan Mitchell and included presentations by JPEG Chairman Greg Wallace and CCITT committee chairman Neil Starkey.

100.    On information and belief, early implementers of the JPEG Standard also put CLI on notice of the public implementation of the JPEG Standard, including:

i)    Adobe Systems, which by 1990 had incorporated the JPEG Standard into its PostScript® Language software.  This event was publicized no later than June 1990 at Adobe's PostScript Developers conference.

ii)    C-Cube Microsystems, which in December 1990 announced a JPEG-enabled image processor.

iii)    Xing Technology, which in March 1991 implemented JPEG in a software program called VT-Compress.

iv)    IBM, which in April 1991 implemented JPEG in its ImagePlus workstation family of programs, which were designed to capture, view, print and

manipulate image documents on an IBM Personal System/2® microchannel architecture computer.

v)    Apple Computer, which in 1991 had implemented JPEG in its QuickTime multimedia technology.

vi)    HP, which in August 1995 launched the Pavilion computer with Microsoft's Windows 95 and Storm Software's EasyPhoto, both of which incorporated the JPEG Standard.

vii)    Dell, which in August 1995 began shipping its computer systems with Microsoft's Windows 95, which incorporated the JPEG Standard.

101.    In addition, by no later than 1992, CLI knew or should have known about the use of the JPEG Standard in a variety of different types of software, including browsers, illustration programs and web-design programs.

102.    Notwithstanding CLI's knowledge as alleged above, on information and belief, CLI made no effort to enforce the '672 patent against any individual or company practicing the JPEG Standard until 2002, more than a decade after learning the details of the JPEG Standard.  In the intervening years, the JPEG Standard became deeply entrenched as the preeminent standard for the digital compression, storage and transmission of still images.  Indeed, since the adoption of the JPEG Standard, Plaintiffs have made significant investments in the implementation of the JPEG Standard. Consumers and other users have created billions of JPEG files and have utilized the JPEG Standard in existing devices and software that will continue for many years to come.

**D.    CLI/Forgent Has Begun an Unlawful Campaign to "Enforce" the '672 Patent in an Effort to Capture the JPEG Standard Illegitimately and to Control the Technology Embodied in the Standard.**

103.    Beginning in 2002, CLI/Forgent changed course on CLI's decade-long policy of non-enforcement of the '672 patent as it relates to JPEG.  In early 2002, CLI/Forgent began an aggressive '672 patent "enforcement" campaign with the apparent goal of capitalizing on the millions of consumers and hundreds of manufacturers dependent upon and locked into the JPEG Standard.  On information and belief, CLI/Forgent knew that consumers of the technology embodied by the JPEG Standard had consistently viewed it as open and free of royalties.

104.    Seeking to assert its aging patent (which expires in 2006) against locked-in companies and consumers who relied on the JPEG Standard being an open, royalty-free standard, CLI/Forgent began in 2002 making royalty demands on companies that make, use or sell the hundreds of products employing the JPEG Standard as a means of extracting potentially hundreds of millions of dollars in royalty payments to which it is not lawfully entitled.  At the same time, it also made veiled threats in the press against end users of JPEG-enabled products.

105.    On information and belief, CLI/Forgent knew that the threat of potential business interruption or catastrophic damages and the certainty of substantial fees and costs required to defend protracted litigation would deter some JPEG users from challenging the patent and instead cause them to take licenses.  CLI/Forgent has made its assertions of patent infringement to create uncertainty and doubt about the validity of JPEG as an open standard and to compel manufacturers of JPEG products to pay it unwarranted sums of money.