**Compression Labs, Incorporated v. Agfa Corporation et al.,**
**C.A. No. 2:04CV-158 DF**


**Motion to Dismiss Under Fed. R. Civ. P. 12(b)(7), or,**
**in the Alternative, Motion to Transfer**


**Attachment D to the**
**Declaration of Joseph M. Casino**


**PART 2 OF 2**

Dockets.Justia.com

FORGENT NETWORKS, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in thousands)

| | FOR THE YEARS ENDED JULY 31, | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net (loss) income from continuing operations | $ (5,010) | $ (3,247) | $ 9,375 |
| Adjustments to reconcile net (loss) income from continuing | | | |
| operations to net cash provided by operating activities: | | | |
| Depreciation and amortization | 3,783 | 2,029 | 2,585 |
| Amortization of leasehold advance and lease impairments | (87) | (87) | (1,490) |
| Provision for doubtful accounts | -- | 16 | 105 |
| Impairment of long-lived assets | 1,147 | 10,411 | 1,140 |
| Amortization of unearned compensation | 4 | 106 | 242 |
| Foreign currency translation loss (gain) | 46 | 319 | -- |
| Loss on sale/disposal of fixed assets | -- | -- | 92 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 9,126 | 7,775 | (8,374) |
| Notes receivable | -- | -- | 148 |
| Inventories | -- | (709) | 26 |
| Prepaid expenses and other current assets | 477 | 528 | (56) |
| Accounts payable | (5,338) | (3,265) | (63) |
| Accrued expenses and other long term obligations | (2,732) | (4,546) | (1,423) |
| Deferred revenue | (269) | 288 | (79) |
| Net cash provided by operating activities | 1,147 | 9,618 | 2,228 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Cash received from sale of Services business | -- | -- | 7,350 |
| Purchases of short-term investments | (98,510) | (3,180) | (3,859) |
| Sales and maturities of short-term investments | 123,663 | 5,052 | 2,729 |
| Purchases of property and equipment | (1,848) | (786) | (136) |
| Sales of property and equipment | 56 | 82 | -- |
| Purchase of business, net of cash acquired | -- | (4,000) | -- |
| (Issuance) collection of notes receivable | (16) | 243 | -- |
| Increase in capitalized software | (617) | (3,471) | (2,814) |
| Decrease (increase) in other assets | 81 | (1,273) | (54) |
| Net cash provided by (used in) investing activities | 22,809 | (7,333) | 3,216 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Net proceeds from issuance of stock | 175 | 1,296 | 502 |
| Purchase of treasury stock | (108) | (2,749) | (1,374) |
| Payments on notes payable | (1,500) | (787) | (753) |
| Proceeds from notes payable | 852 | 1,353 | 464 |
| Net cash used in financing activities | (581) | (887) | (1,161) |
| **CASH FLOWS FROM DISCONTINUED OPERATIONS:** | | | |
| Net cash (used in) provided by discontinued operations | (14,414) | 662 | (1,859) |
| Loss on sale of Services business | -- | -- | 1,954 |
| Effect of translation exchange rates on cash | 19 | (671) | (414) |
| Net increase in cash and equivalents | 8,980 | 1,389 | 3,964 |
| Cash and equivalents at beginning of period | 6,868 | 15,848 | 17,237 |
| Cash and equivalents at end of period | $ 15,848 | $ 17,237 | $ 21,201 |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | | |
| Interest paid | $ 134 | $ 144 | $ 74 |
| Income taxes paid | 129 | -- | -- |
| Income taxes refunded | -- | 177 | -- |
| Contingent notes payable issued for acquired assets | -- | 700 | -- |
| Issuance of restricted stock to employees and consultants | -- | 333 | -- |
| Net shares received in settlement | (173) | -- | -- |
| Mark to market of investments | 8,461 | 1,541 | -- |

The accompanying notes are an integral part of these consolidated
financial statements.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

1.    THE COMPANY

Forgent Networks, Inc. ("Forgent" or "Company") is an enterprise
meeting automation software and professional services provider, which enables
organizations to schedule and manage their meeting environments effectively and
efficiently, and a licensor of intellectual property. Founded in 1985 and using
its expertise in the videoconferencing equipment industry, the Company
manufactured and installed videoconferencing endpoints. In January 2002, the
Company sold its manufacturing products business, shifting its focus from
hardware manufacturing to enterprise software and services. To further expedite
this shift, during fiscal year 2002, Forgent also sold its integration business,
which designed and installed custom integrated visual communication systems
primarily in meetings spaces of large corporations. During fiscal year 2003, the
Company completed the divestiture of its videoconferencing hardware services
business, devoting itself entirely to its enterprise meeting automation software
and professional services business, as well as its intellectual property
licensing business.

The Company's current flagship product, Forgent ALLIANCE, is the
industry's first enterprise meeting automation software that is a complete
integration of scheduling with rich media automation, driven from a common user
interface, and consists of two main products: ALLIANCE SCHEDULER(TM) and
ALLIANCE MEDIA MANAGER(TM). ALLIANCE SCHEDULER(TM), the enhanced product based
on Forgent's Global Scheduling System or GSS, streamlines conference scheduling,
reduces conflicts associated with complex meetings and empowers users to quickly
and easily schedule all aspects of a meeting - adding facilities, rich media
communications and other meeting services - through popular corporate
calendaring tools, Microsoft Outlook(R) or IBM Lotus Notes(R). ALLIANCE MEDIA
MANAGER(TM) is a multi-vendor, multi-protocol media management platform based on
Forgent's Video Network Platform, or VNP, that automates rich media enabled
meetings by configuring and managing all media components of a conference
through a Common Operating Environment and continues to monitor the media to
detect and recover if problems occur.

Forgent's intellectual property licensing business is derived from the
Company's Patent Licensing Program. The Company's Patent Licensing Program is
currently focused on generating license revenues relating to the Company's data
compression technology embodied in U.S. Patent No. 4,698,672 and its foreign
counterparts. Other patents are currently being investigated for additional
licensing opportunities, although none have been identified at this time.

As the Company has evolved, it has focused its efforts on managing the
meeting environment, adding audio and web capabilities to its deep understanding
and expertise in videoconferencing. With its refocused efforts and resources,
Forgent believes it is poised to provide the greatest opportunity for long-term
success for the Company and its stockholders.

2.    SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION

The consolidated financial statements have been prepared in accordance
with accounting principles generally accepted in the United States and include
the accounts of Forgent's wholly owned subsidiaries. All significant
intercompany transactions and balances have been eliminated in the
consolidation. Preparation of the consolidated financial statements in
conformity with accounting principles generally accepted in the United States
requires management to make estimates and assumptions that affect the reported
amounts of the assets and liabilities and disclosure of contingent assets and
liabilities at the date of the financial statements and the reported amounts of
revenues and expenses during the reporting period. The more significant
estimates made by management include the valuation allowance for the gross
deferred tax asset, capitalization of software development costs, contingency
reserves, useful lives of fixed assets, the determination of the fair value of
its long-lived assets, including its intangible assets, the loss from
discontinued operations, and the loss from its impairments. Actual amounts could
differ from the estimates made. Management periodically evaluates estimates used
in the preparation of the financial statements for continued reasonableness.
Appropriate adjustments, if any, to the estimates used are made prospectively
based upon such periodic evaluation.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

REVENUE RECOGNITION

The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is probable. The Company recognizes revenue in accordance with Statement of Position ("SOP") 97-2, Software Revenue Recognition, as amended by SOP 98-4 and SOP 98-9, and Securities and Exchange Commission Staff Accounting Bulletin 101, Revenue Recognition in Financial Statements.

The Company does not recognize revenue for agreements with rights of return, refundable fees, cancellation rights or acceptance clauses until such rights of return, refund or cancellation have expired or acceptance has occurred. The Company's arrangements with resellers do not allow for any rights of return.

Software and professional service revenue consists of license and service fees. License fee revenue is earned through the licensing or right to use the Company's software and from the sale of specific software products. Service fee income is earned through the sale of maintenance and technical support, training, installation, and other professional services related to the sale of Forgent's enterprise software. The Company allocates the total fee to the various elements based on the relative fair values of the elements specific to the Company. The Company determines the fair value of each element in the arrangement based on vendor-specific objective evidence ("VSOE") of fair value. When VSOE of fair value for the license element is not available, license revenue is recognized using the residual method. Under the residual method, the contract value is first allocated to the undelivered elements (maintenance and service elements) based upon their VSOE of fair value; the remaining contract value, including any discount, is allocated to the delivered element. For maintenance, VSOE of fair value is based upon the renewal rate specified in each contract. For training and installation services, VSOE of fair value is based upon the rates charged for these services when sold separately. Revenue allocated to maintenance and technical support is recognized ratably over the maintenance term (typically one year). Revenue allocated to installation and training is recognized upon completion of these services due to their short-term nature. The Company's training and installation services are not essential to the functionality of its products as (1) such services are available from other vendors and (2) the Company has sufficient experience in providing such services. For instances in which VSOE cannot be determined for undelivered elements, and these undelivered elements do not provide significant customization or modification of its software product, Forgent recognizes the entire contract amount ratably over the period during which the services are expected to be performed.

Intellectual property licensing revenue is derived from the Company's Patent Licensing Program, which is currently focused on generating license revenues relating to the Company's data compression technology embodied in U.S. Patent No. 4,698,672, and its foreign counterparts. Gross intellectual property licensing revenue is recognized at the time a license agreement has been executed and related costs are recorded as cost of sales. The cost of sales on the intellectual property licensing business relates to the legal fees incurred on successfully achieving signed agreements. The contingent legal fees are based on a percentage of the licensing revenues received on signed agreements and are paid to Jenkens & Gilchrist, a national law firm. The percentage payment to Jenkens & Gilchrist was set based on a sliding scale that began during the quarter ended April 30, 2002 at 35% and increased to 50% based on the aggregate recoveries achieved. Future percentage payments will be 50% of license receipts per the agreement with Jenkens & Gilchrist.

Other revenue consists of integration services. Integration revenues consist of network consulting to assist customers with their video networking requirements, including baseline audits, preparation of capacity plans, development of time-saving migration and implementation plans, and customized integration of the Company's software with existing third-party applications or with customers' proprietary in-house applications. Integration revenues are recognized after the customized systems have been tested, installed, and the Company has no significant further obligations as evidenced by acceptance from the customer.

Deferred revenue includes amounts received from customers in excess of revenue recognized, and is comprised of deferred maintenance, service and other revenue. Deferred revenues are recognized in the Consolidated Statement of Operations over the terms of the arrangements, primarily ranging from one to three years.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

CREDIT POLICY

The Company reviews potential customers' credit ratings to evaluate customers' ability to pay an obligation within the payment term, which is usually net thirty days. When payment is reasonably assured, and no known barriers exist to legally enforcing the payment, the Company extends credit to customers, not to exceed 10% of their net worth. An account is placed on "Credit Hold" if it is thirty days past due or if a placed order exceeds the credit limit, and may be placed on "Credit Hold" sooner if circumstances warrant. The Company follows its credit policy consistently and constantly monitors all of its delinquent accounts for indications of uncollectibility.

SOFTWARE DEVELOPMENT COSTS

Costs incurred in connection with the development of software products are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 86, "Accounting for the Costs of Computer Software to Be Sold, Leased or Otherwise Marketed." Costs incurred prior to the establishment of technological feasibility are charged to research and development expense. Software development costs are capitalized after a product is determined to be technologically feasible and is in the process of being developed for market. Amortization of capitalized software begins upon initial product shipment. Software development costs are amortized over the estimated life of the related product (generally thirty-six months), using the straight-line method.

The Company capitalized internal software development costs of $617, $3,473, and $2,814 for the years ended July 31, 2001, 2002, and 2003, respectively. No amortization of such costs was recorded for the year ended July 31, 2001. Amortization of capitalized software development costs for the years ended July 31, 2002 and 2003 was $552 and $1,524, respectively. All the amortization of capitalized software development costs was charged to cost of sales for software and professional services.

During the year ended July 31, 2002, management made the decision to discontinue further development efforts of a software project, and abandoned the project previously capitalized. The resulting charge of $2,381 was included as a component of cost of sales during the year ended July 31, 2002. No capitalized software development costs were impaired for the years ended July 31, 2001 or July 31, 2003.

CASH AND EQUIVALENTS

Cash and equivalents include cash and investments in highly liquid investments with an original maturity of three months or less when purchased. As of July 31, 2003, the Company holds $730 in certificates of deposit to secure its note payable to Silicon Valley Bank and one capital lease.

SHORT-TERM INVESTMENTS

Short-term investments are carried at market value. Short-term investments consist of funds primarily invested in mortgage-backed securities guaranteed by the U.S. government, government securities, and commercial paper, and all mature within one year of July 31, 2002 and 2003. The carrying amounts of the Company's short-term investments at July 31, 2002 and 2003 are as follows:

| | 2002 | | 2003 | |
| | COST | MARKET VALUE | COST | MARKET VALUE |
| --- | --- | --- | --- | --- |
| Corporate obligations | $ 722 | $ 722 | $ 1,644 | $ 1,644 |
| Other | 1,993 | 1,993 | 2,201 | 2,201 |
| | $ 2,715 | $ 2,715 | $ 3,845 | $ 3,845 |

The Company accounts for investment securities under SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities." SFAS No. 115 requires investment securities to be classified as held-to-maturity, trading or available-for-sale based on the characteristics of the securities and the activity in the investment

42

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

portfolio. At July 31, 2002 and July 31, 2003, all investment securities are classified as available-for-sale. The Company specifically identifies its short-term investments and uses the cost of the investments as the basis for recording unrealized gains and losses as part of other comprehensive income on the Consolidated Balance Sheet and for recording realized gains and losses as part of other income and expenses on the Consolidated Statements of Operations. As of July 31, 2002 and July 31, 2003, the Company did not have any unrealized gains or losses on available-for-sale securities. The Company realized $6,514, $1,670, and $0 in related gains during the years ended July 31, 2001, 2002, and 2003 respectively.

ALLOWANCE FOR DOUBTFUL ACCOUNTS

       The Company maintains an allowance for doubtful accounts to estimate losses from uncollectable customer accounts receivables. This estimate is based in the aggregate, on historical collection experience, age of receivables and general economic conditions. It also considers individual customers' payment experience, credit-worthiness and age of receivable balances.

PROPERTY AND EQUIPMENT

       Property and equipment are recorded at cost. Internal support equipment is video teleconferencing equipment used internally for purposes such as sales and marketing demonstrations, Company meetings, testing, troubleshooting customer problems, and engineering, and is recorded at manufactured cost, if the Company manufactured the asset or is recorded at cost, if purchased. Depreciation and amortization are recorded using the straight-line method over the estimated economic useful lives of the assets, which range from two to eight years, over the lease term, or over the life of the improvement of the respective assets, as applicable. Repair and maintenance costs are expensed as incurred. The Company periodically reviews the estimated economic useful lives of its property and equipment and makes adjustments, if necessary, according to the latest information available.

INTANGIBLE ASSETS

       Intangible assets include the goodwill that resulted from various acquisitions by the Company. Amortization periods for the intangible assets associated with these acquisitions range from 8 to 15 years. In March 1999, the Company acquired substantially all of the assets of Vosaic LLP, an Internet video software and technology company. Amortization expenses were $0.1 million in fiscal year 2001. The amortization expenses relate to the amortization of goodwill resulting from this acquisition. Accumulated amortization of all goodwill was $6,192 at July 31, 2001.

       Effective August 1, 2001, the Company chose early adoption of SFAS No. 142, "Goodwill and Other Intangibles Assets," which recognizes that since goodwill and certain intangible assets may have indefinite useful lives, these assets are no longer required to be amortized but are to be evaluated at least annually for impairment. In accordance with SFAS No. 142, the Company is required to complete its transitional impairment test, with any resulting impairment loss recorded as a cumulative effect of a change in accounting principle. Subsequent impairment losses are reflected in operating income from continuing operations on the Consolidated Statement of Operations. As a result of adopting of SFAS No. 142, the Company did not record any goodwill amortization expenses during the years ended July 31, 2002 and 2003. Additionally, as a result of the transitional impairment test, the Company did not record any impairment of its goodwill for the year ended July 31, 2002.

       During the third fiscal quarter of 2003, Forgent believed that the ongoing difficult economic environment and its associated negative impact on the Company's software business represented an indicator of a possible impairment on the Company's software business. Therefore, the Company was required to perform an impairment analysis in accordance with SFAS No. 142 to determine the fair value of the assets and liabilities of its software business. As a result of this analysis, Forgent recorded a $1,331 impairment of its goodwill related to its acquisition of GSS. This impairment was recorded as part of continuing operations on the Company's Consolidated Statement of Operations.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

FOREIGN CURRENCY TRANSLATION

The financial statements of the Company's foreign subsidiaries are measured using the local currency as the functional currency. Accordingly, the assets and liabilities of the subsidiaries are translated at current rates of exchange at the balance sheet date. The resulting gains or losses from translation are included in a separate component of stockholders' equity. Income and expense from the subsidiaries are translated using monthly average exchange rates.

INCOME TAXES

The Company accounts for income taxes under SFAS No. 109, "Accounting for Income Taxes," which requires the liability method of accounting for income taxes. Under the liability method, deferred taxes are determined based on the difference between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect in the years in which the differences are expected to reverse.

CONCENTRATION OF CREDIT RISK

The Company sells its enterprise software and services to various companies across several industries, including third-party resellers. The Company performs ongoing credit evaluations of its customers and maintains reserves for potential credit losses. The Company requires advanced payments or secured transactions when deemed necessary.

Forgent's Patent Licensing Program involves risks inherent in licensing intellectual property, including risks of protracted delays, possible legal challenges that would lead to disruption or curtailment of the licensing program, increasing expenditures associated with pursuit of the program, and other risks that could adversely affect the Company's licensing program. Additionally, the U.S. patent, which has generated the intellectual property licensing revenues, expires in October 2006 and its foreign counterparts expire in September 2007. Thus, there can be no assurance that the Company will be able to continue to effectively license its technology to other companies.

FAIR VALUE OF FINANCIAL INSTRUMENTS

The carrying amount of short-term investments and notes payable approximates fair value because of the short maturity and nature of these instruments. The Company places its cash investment in quality financial instruments and limits the amount invested in any one institution or in any type of instrument. The Company has not experienced any significant losses on its investments.

LONG-LIVED ASSETS

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 supercedes SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of," as well as the accounting and reporting provisions relating to the disposal of a segment of a business as required by Accounting Principles Board No. 30. Effective August 1, 2002, the Company adopted SFAS No. 144, which did not have a significant impact on its financial statements.

EMPLOYEE STOCK PLANS

The Company determines the fair value of grants of stock, stock options and other equity instruments issued to employees in accordance with SFAS No. 123, "Accounting and Disclosure of Stock-Based Compensation," which was amended by SFAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure." SFAS No. 123 encourages, but does not require, companies to recognize compensation expense for grants of stock, stock options, and other equity instruments to employees based on their estimated fair market value on the date of grant. SFAS No. 148 provides alternative methods of transition for a voluntary change to a fair value based method of accounting for stock-based compensation. As allowed by SFAS No. 123, the Company has opted to continue to apply the existing accounting rules contained in APB No. 25, "Accounting for Stock Issued to

44

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

Employees." SFAS No. 123 and SFAS No. 148 have had no effect on the Company's financial position or results of operations.

The Company records unearned compensation related to equity instruments that are issued at prices which are below the fair market value of the underlying stock on the measurement date. Such unearned compensation is amortized ratably over the vesting period of the related equity instruments.

The Company applies APB No. 25 and related interpretations in accounting for its stock option plans for grants to employees. Accordingly, no compensation cost is recognized for its stock option plans unless options are issued at exercise prices that are below the market price on the measurement date. Had compensation cost for the Company's stock option plans been determined based on the fair market value at the grant dates for awards under those plans consistent with the fair value method, the Company's net (loss) income per share would have been reflected by the following pro forma amounts for the years ended July 31, 2001, 2002 and 2003:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Net (loss) income |  |  |  |
| Net (loss) income as reported | $ (32,540) | $ (6,103) | $ 8,020 |
| Add: Stock-based employee compensation expense included in reported net (loss) income, net of related tax effects | $ - | $ - | $ 11 |
| Deduct: Stock-based employee compensation expense determined under fair value-based method for all awards, net of related tax effects | $ (2,931) | $ (1,664) | $ (2,178) |
| Pro forma (loss) income | $ (35,471) | $ (7,767) | $ 5,853 |
| Basic (loss) income per common share: |  |  |  |
| As reported | $ (1.31) | $ (0.25) | $ 0.33 |
| Pro forma | (1.43) | (0.31) | 0.24 |
| Diluted (loss) income per common share: |  |  |  |
| As reported | $ (1.31) | $ (0.25) | $ 0.32 |
| Pro forma | $ (1.43) | $ (0.31) | $ 0.23 |

The pro forma effect on net (loss) income for 2001, 2002, and 2003 is not representative of the pro forma effect on net (loss) income in future years because it does not take into consideration pro forma compensation expense related to grants issued prior to 1996.

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted-average assumptions used for grants during the years ended July 31, 2001, 2002, and 2003:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Dividend yield | -- | -- | -- |
| Expected volatility | 73.57% | 78.87% | 82.63% |
| Risk-free rate of return | 4.95% | 4.00% | 3.27% |
| Expected life | 7.41 years | 5.84 years | 6.60 years |

45

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

RECENT ACCOUNTING PRONOUNCEMENTS

In April 2003, the Financial Accounting Standards Board ("FASB") issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." The Statement amends and clarifies accounting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities." This Statement is effective for contracts entered into or modified after June 30, 2003, for hedging relationships designated after June 30, 2003, and to certain preexisting contracts. Forgent adopted the provisions of SFAS No. 149 effective the beginning of the fourth quarter of fiscal year 2003. Forgent had no derivative instruments as of July 31, 2003 or any hedging activities during the year ended July 31, 2003. Thus, the adoption of SFAS No. 149 had no impact on the Company's financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities," in an effort to expand upon and strengthen existing accounting guidance that addresses when a company should include in its financial statements the assets, liabilities and activities of another entity. Interpretation 46 requires the primary beneficiary, an entity that is subject to a majority of the risk of loss from the variable interest entity's ("VIE") activity or is entitled to receive a majority of the VIE's residual returns or both, to consolidate that VIE. The interpretation also requires disclosure about VIEs that a company is not required to consolidate but in which it has a significant variable interest. Interpretation 46 is effective for all new VIEs created or acquired after January 31, 2003. For VIEs created prior to February 1, 2003, the provisions of Interpretation 46 must be applied for the first interim or annual period beginning after June 15, 2003. The Company did not have a variable interest in any VIEs as of July 31, 2003 and therefore does not expect the adoption of these provisions to have a material impact on its financial position or results of operations.

In December 2002, the FASB issued SFAS No. 148, "Accounting for Stock-Based Compensation--Transition and Disclosure", which amends SFAS No. 123, "Accounting for Stock-Based Compensation". SFAS No. 148 provides alternative methods of transition for a voluntary change to a fair value based method of accounting for stock-based compensation. SFAS No. 148 also amends the disclosure requirements of SFAS No. 123 to require additional disclosures in both annual and interim financial statements regarding the effects of stock-based compensation. Forgent adopted the disclosure provisions of SFAS No. 148 effective the beginning of the third quarter of fiscal year 2003. The adoption of SFAS No. 148 had no impact on the Company's financial position or results of operations.

In November 2002, the FASB reached a consensus on EITF Issue No. 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables" ("Issue 00-21"). Issue 00-21 sets out criteria for whether revenue can be recognized separately from other deliverables in a multiple deliverable arrangement. The criteria consider whether the delivered item has stand-alone value to the customer, whether the fair value of the delivered item can be reliably determined and the rights of returns for the delivered item. Forgent adopted Issue 00-21 on August 1, 2003 and the adoption had no significant impact on the Company's results of operations, financial position or cash flows.

In June 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities." SFAS 146 addresses accounting for restructuring costs and supersedes previous accounting guidance, principally Emerging Issues Task Force ("EITF") No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." SFAS No. 146 requires that the liability associated with exit or disposal activities be recognized when the liability is incurred. As a contrast under EITF 94-3, a liability for an exit cost is recognized when a Company commits to an exit plan. SFAS No. 146 also establishes that a liability should initially be measured and recorded at fair value. Accordingly, SFAS No. 146 may affect the timing and amount of recognizing restructuring costs. The Company adopted the provisions of this statement for any restructuring activities initiated after December 31, 2002. No such activities were initiated during the year ended July 31, 2003.

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 supercedes SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of," as well as the accounting and reporting provisions relating to the

46

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

disposal of a segment of a business as required by Accounting Principles Board No. 30. Effective August 1, 2002, the Company adopted SFAS No. 144, which did not have a significant impact on its financial statements.

3.      DISCONTINUED OPERATIONS

On July 3, 2003, Forgent sold substantially all of the assets of its videoconferencing hardware services business ("Services Business"), based in King of Prussia, Pennsylvania, to an affiliate of Gores Technology Group ("Gores"), a privately held international acquisition and management firm. The divestiture is a strategic move designed to enable Forgent to focus on growing its enterprise software and professional services and its intellectual property licensing businesses, increasing its cash balances, improving its overall gross margin and reducing its operating expenses. The assets sold include accounts receivable, inventory, fixed assets, certain prepaid assets, and goodwill. As consideration for the sale of the Services Business, the Company received $7,350 in cash, which was net of a $400 transaction extension fee, and the assumption of substantially all of the Services Business' liabilities, including deferred maintenance revenue, identified accounts payable and capital lease obligations.

An additional $2,250 in cash has been held for possible purchase price adjustments and indemnity claims. Funds held for purchase price adjustments equal $1,250, $1,000 of which will remain in escrow for a period of 120 days subsequent to July 3, 2003. These funds will be distributed to the Company pursuant to the terms of the definitive purchase agreement and are adjusted if the net assets transferred by the Company to Gores on July 3, 2003 are determined to be less than $3,800 and/or the deferred revenue assumed by Gores on July 3, 2003 is determined to be greater than $7,600. The indemnity escrow, also consisting of $1,000, will remain in escrow for a period of 18 months subsequent to July 3, 2003. Details of this transaction and other important information are set forth in the Company's proxy statement for fiscal year 2002. Although management does not anticipate any purchase price adjustments or indemnity claims payable, Forgent cannot provide any assurances that it will receive some or any of the held funds.

Forgent assigned its lease for approximately 6 thousand square feet of office space in Kennesaw, Georgia to Gores, which was accepted by the landlord with no further obligations by Forgent. This office space was utilized as a sales office for the Services Business. Furthermore, Forgent did not remain contingently liable for performance on existing contracts or future contracts entered into by Gores. The Company does not have any continuing involvement in the go-forward operations of the Services Business.

In connection with sale of the Services Business, Forgent and Gores entered into a transition services agreement, whereby the Company will provide, for a fee at actual cost, certain transition services for Gores related to the assets acquired and liabilities assumed in the sale. Forgent and Gores also entered into a reseller agreement, whereby Gores may resell the Company's enterprise software products, and a co-marketing arrangement, whereby the Company will receive a commission for referring videoconferencing related service business to Gores. Gores retained approximately 70 employees employed by the Services Business. Upon completion of the sale of the Services Business, Forgent employed approximately 95 employees.

In April 2002, Forgent sold inventory and certain other assets related to its integration business to SPL Integrated Solutions ("SPL"), a leading nationwide integrator that designs and installs large-display videoconferencing systems and fully integrated multimedia systems for corporations, educational institutions and government agencies. As a result of the sale, Forgent received $150 in cash and a $282 note receivable from SPL, which was fully paid as of July 31, 2003. SPL absorbed 15 members of Forgent's Professional Services Integration team and re-located to Forgent's videoconferencing hardware services facility in King of Prussia, Pennsylvania, where the combined team of engineers and technicians manage and execute the delivery of audio-video system integration and support. The assets related to the integration business were sold for approximately their net book value and thus an immaterial amount of gain was recorded during the third quarter of fiscal 2002.

In January 2002, Forgent sold the operations and substantially all of the assets of its products business segment, including the VTEL name, to VTEL Products Corporation ("VTEL"), a privately held company created by the former Vice-President of Manufacturing and two other senior management members of the products business segment. As a result, the Company received cash of $500, a 90-day subordinated promissory note, bearing interest at an annual rate of five percent, for $967, a 5-year subordinated promissory note, bearing interest at an annual rate of

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

five percent, for $5,000 and 1,045 shares of common stock, par value $0.01 per share, representing 19.9% of the new company's fully diluted equity. Additionally, Forgent and VTEL entered into a general license agreement, in which VTEL was granted certain non-exclusive rights in and to certain patents, software, proprietary know-how, and information of the Company that was used in the daily operations of the products business segment. The group of management who purchased the products segment (now referred to as VTEL) put up $500 of their own money at the closing. In addition, VTEL also received a $750 line of credit from a bank, which was not guaranteed by Forgent. The facilities lease was signed over to VTEL, which was accepted by the landlord with no further obligations by Forgent. Furthermore, Forgent did not remain contingently liable for performance on existing contracts or future contracts entered into by the newly formed entity. The Company does not have any continuing involvement in the go-forward operations of VTEL. It does not have veto power or any means to exercise influence over the operations of that company. The Company has made no guarantees with respect to any business matters as they relate to VTEL nor are there any situations whereby the Company would be required to reassume any obligations of VTEL.

Due to uncertainties regarding VTEL's future business, Forgent fully reserved its equity interest in VTEL. VTEL did not remit payment on its first subordinated promissory note due in April 2002, as stipulated in the sales agreement. As a result of this default and due to the uncertainty in collecting the two outstanding notes from VTEL, the Company recorded a $5,967 charge for the reserve of both notes from VTEL for the year ended July 31, 2002. This charge was accounted for as part of continuing operations on the Company's Consolidated Statement of Operations. However, management is continuing its efforts on collecting these outstanding notes receivables despite the low probability of collection. Since the sale of the products business occurred several months after it was originally anticipated to close, and since the operations performed significantly worse than expected, an additional loss of $8,171 was recorded to discontinued operations in fiscal year 2002. As of July 31, 2001, the Company estimated the loss from the disposal of the products business segment to be $1,120. During the 2002 fiscal year, Forgent recorded an additional $255 in expenses associated with the completion of the sale.

As a result of the sales of the videoconferencing hardware services, integration and products businesses, the Company has presented these businesses as discontinued operations on the accompanying consolidated financial statements. The operating results of the videoconferencing hardware services, integration and products businesses for the fiscal years ended July 31, 2001, 2002, and 2003 were as follows:

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Revenues from unaffiliated customers | 85,488 | 41,548 | 14,824 |
| (Loss) income from discontinued operations | (26,410) | (2,601) | 599 |

The net assets from discontinued operations presented on the Consolidated Balance Sheets were as follows:

|  | 2002 | 2003 |
|---|---|---|
| Current assets | $     5,100 | $     – |
| Non-current assets | 11,662 | – |
|  | 16,762 | – |
| Current liabilities | (8,629) | – |
| Long-term liabilities | (1,015) | – |
|  | (9,644) | – |
| Total net assets from discontinued operations | $     7,118 | $     – |

48

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

4.    ASSET IMPAIRMENT

During the fiscal year ended July 31, 2003, Forgent recorded impairment losses on the Consolidated Statement of Operations as follows:

| | FOR THE YEAR ENDED JULY 31, 2003 | | |
| | (IN THOUSANDS) | | |
| | CONTINUING OPERATIONS | DISCONTINUED OPERATIONS | TOTAL IMPAIRMENT |
|---|---|---|---|
| Property lease | $      502 | $      454 | $      956 |
| Notes & interest receivables | (693) | | (693) |
| Goodwill | 1,331 | - | 1,331 |
| TOTAL IMPAIRMENT | $    1,140 | $      454 | $    1,594 |

In November 2002, the GSS development operations in Atlanta, Georgia, were relocated to Forgent's headquarters in Austin, Texas. Management was unable to sublease the vacated space and upon review of the future undiscounted cash flows related to this lease, management recorded an impairment charge of $21. Additionally, management analyzed the discounted cash flows related to its Wild Basin property lease and subleases over the remainder of the lease term. Although Forgent was able to sublease the vacated space more quickly than originally anticipated, the rates on the subleases were considerably less than originally anticipated due to depressed current market rates. Therefore, management calculated the economic value of the lost sublease rental income and recorded an additional charge of $481. As of July 31, 2003, Forgent had $884 recorded as a liability on the Consolidated Balance Sheet related to its Wild Basin property. Forgent remained obligated to make lease payments in accordance with the original terms of both leases. Both the Atlanta and Wild Basin lease impairments were recorded as part of continuing operations on the Company's Consolidated Statement of Operations.

Forgent's discontinued integration and videoconferencing hardware services businesses are located at its facilities in King of Prussia, Pennsylvania, which leases approximately 41 thousand square feet. As a result of the sale of Forgent's integration business, approximately 19% of the total lease space was subleased to SPL, based on then current market values. As a result of the sale of Forgent's videoconferencing hardware services business to Gores, approximately 37% of the total lease space was subleased to Gores, based on current market values. SPL, Gores, and another subtenant sublease 100% of the total lease space. However, in October 2003, SPL's sublease terminated and the subtenant vacated its leased space. Therefore, management reviewed the undiscounted cash flows of this lease and the related subleases, determined the economic value of the lost sublease rental income and recorded a one-time charge of $454. Forgent remained obligated to make lease payments in accordance with the original term of the lease. Since Forgent fully discontinued its operations in King of Prussia, the lease impairment for this facility was recorded as part of discontinued operations on the Company's Consolidated Statement of Operations.

During the 2003 fiscal year, Forgent recorded $312 in accrued interest on both outstanding notes receivable from VTEL Products Corporation ("VTEL") and fully reserved the accrued interest. Management agreed with VTEL's management during the first fiscal quarter of 2003 to offset Forgent's accounts payable to VTEL with its accounts receivable, notes receivable, and interest receivable from VTEL. The Forgent liability was fully offset with the accounts receivable and the accrued interest and partially offset with the note in default, thus relieving $693 of the related reserves. Since the initial $5,967 charge to reserve the VTEL notes receivable were reported as part of the asset impairment from continuing operations, the related reduction of the reserves is also reported as part of the asset impairment from continuing operations. No cash was exchanged with these transactions.

Additionally, the ongoing difficult economic environment and its associated negative impact on the Company's software business during fiscal year 2003 represented an indicator of a possible impairment on the Company's software business. Therefore, the Company was required to perform an impairment analysis in accordance with Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" to determine the fair value of the assets and liabilities of its software business. As a result of this analysis, Forgent

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

recorded a $1,331 impairment of its goodwill related to its acquisition of GSS. This impairment was recorded as part of continuing operations on the Company's Consolidated Statement of Operations.

During the fiscal year ended July 31, 2002, Forgent recorded impairment losses on the Consolidated Statement of Operations as follows:

|  | FOR THE YEAR ENDED JULY 31, 2002 | | |
|  | (IN THOUSANDS) | | |
|  | CONTINUING OPERATIONS | DISCONTINUED OPERATIONS | TOTAL IMPAIRMENT |
| --- | --- | --- | --- |
| Property lease | $    2,063 | $      – | $    2,063 |
| Notes receivable | 5,967 | – | 5,967 |
| IMPAIRMENT IN OPERATING EXPENSES | 8,030 | – | 8,030 |
| Capitalized software | 2,381 | – | 2,381 |
| TOTAL IMPAIRMENT | $  10,411 | $      – | $  10,411 |

Due to the disposition of the Products business in fiscal year 2002, the VTEL personnel relocated from Forgent's headquarters at 108 Wild Basin Road in Austin, Texas to VTEL's headquarters at 9208 Waterford Centre Blvd. in Austin, Texas. This relocation left a vacancy of approximately 52 thousand rentable square feet, or 38% of the total lease space. Additionally, Forgent had existing unoccupied space inventory due to the downsizing of the Company relating to its restructurings. In fiscal year 2002, Forgent was able to sublease some of the vacated space, but was unable to fully sublease the space due to the economic downturn during the year. Therefore, management analyzed the future undiscounted cash flows related to the lease on the Wild Basin property and determined the economic value of the lost sublease rental income. As a result, Forgent recorded a $2,063 impairment charge for the unleased space as of July 31, 2002. However, Forgent remained obligated to make lease payments in accordance with the original term of the lease. Additionally, Forgent received two subordinated promissory notes from VTEL as a result of the sale of the Products business. VTEL did not remit payment on its first subordinated promissory note due in April 2002, as stipulated in the sales agreement. As a result of this default and due to the uncertainty in collecting both of the outstanding notes from VTEL, the Company recorded a $5,967 charge for the reserve of both notes from VTEL for the year ended July 31, 2002. These impairments were reported as part of continuing operations on the Consolidated Statement of Operations.

The Company's OnScreen24(TM) operations, which were folded back into Forgent's core operations in January 2001, developed a video streaming technology, which is a server application with the abilities to create video e-mail programs and to store streamed video for later non-real time playback. Initially, management intended to leverage these efforts and further develop this technology as an added feature to its VNP software. Based upon customer feedback regarding the VNP software during fiscal year 2002, customers did not need advanced features but desired fundamental network management applications with more robust device level support and valued added network level instrumentation for ISDN and IP networks to enable them to understand and monitor how well their networks were performing. Therefore, management determined the video streaming technology would not be used in the development of VNP. As a result, the $2,381 capitalized software development costs associated with this technology was impaired during the year ended July 31, 2002 and was reported as part of cost of sales.

During fiscal year 2001 management implemented a strategy to divest all non-core operations to focus on returning to profitability. Therefore, the Company folded its OnScreen24 subsidiary's operations back into the core business. OnScreen24 primarily operated from Forgent's property in Sunnyvale, California. During the third quarter of fiscal 2001, the Company sold its equity interest in the real estate lease for $500 and recorded a related $1,147 impairment for the leasehold improvements at the Sunnyvale facility. The $1,147 impairment in fiscal 2001 was all related to continuing operations.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

5.    ACQUISITIONS

As approved by each company's board of directors, Forgent acquired certain assets and liabilities in a purchase business combination structured as an asset purchase of Global Scheduling Solutions, Inc., a global provider of enterprise conference room scheduling and resource management solutions, on June 4, 2002. This business combination was completed in order for Forgent to expand the quality and reach of its existing enterprise software sales and marketing efforts and to acquire an enterprise scheduling software solution to complement its Video Network Platform solution.

Forgent paid Global Scheduling Solutions, Inc. a combination of $3,750 in cash, $250 held in escrow for representations and warranties, $700 tied to certain future contingent "earn-out" payments and the assumption of certain liabilities. The $700 liability was dependent upon the purchased assets generating a certain level of net revenue between April 2002 and September 2002. The acquisition was accounted for as a purchase of assets. Accordingly, the purchase price was allocated to the tangible and identifiable intangible assets acquired based on their estimated fair values at the date of acquisition. Total cost in excess of the tangible and intangible assets acquired of $5,229 was recorded as goodwill. The following table shows the amounts assigned to each major asset and liability class as of the date of acquisition:

| | |
|---|---:|
| Accounts Receivable | $ 269 |
| Software | 100 |
| Computers &Equipment | 22 |
| Goodwill | 5,229 |
| | ------- |
| TOTAL ASSETS | $ 5,620 |
| | ======= |
| Accounts Payable | $ 577 |
| Accrued Liabilities | 92 |
| Deferred Revenue | 251 |
| | ------- |
| TOTAL LIABILITIES | $ 920 |
| | ======= |

During the 2003 fiscal year, management settled the $700 contingent liability and paid Global Scheduling Solutions, Inc. $375. As part of the settlement, the $250 held in escrow was relieved. Therefore, the related goodwill was adjusted for the remaining contingent liability of $325 and the $250 escrow. Additionally, the related goodwill was adjusted for $55 as a result of finalizing the valuation of the assets acquired and liabilities assumed. As of January 31, 2003, the Company no longer had any liabilities owed to Global Scheduling Solutions, Inc.

6.    RESTRUCTURING ACTIVITIES

In August 2001, the Company restructured its organization, which involved the termination of 65 employees, or 17% of the workforce, who were assisted with outplacement support and severance. The reduction affected 16 employees in Austin, Texas, 30 employees in King of Prussia, Pennsylvania, and 19 employees in remote and international locations. The restructuring was the result of eliminating certain business elements that did not contribute to Forgent's core competencies at that time as well as efforts to increase efficiencies and to significantly reduce administrative costs. All of the employees were terminated and the Company recorded a one-time charge of $818 in the first quarter of fiscal 2002 for the restructuring. This charge is included in the loss from discontinued operations on the Consolidated Statement of Operations. As of July 31, 2002, all of the involuntary termination benefits had been paid.

7.    SALE OF ACCOUNTS RECEIVABLE

During fiscal 2002, the Company sold $9,279 of its outstanding accounts receivable, without any recourse, in efforts to recapture cash balances lost due primarily to an unanticipated significant drop in sales from discontinued operations and the remaining payments of outstanding payables related to the discontinued operations. Silicon Valley Bank purchased the assets at face value, less a fee of approximately 1.8% of the value of the accounts receivable sold and a one-time set-up fee of $13. The Company received proceeds from Silicon Valley Bank of $9,100.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

Under the provisions of SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," which Forgent adopted as of January 31, 2002, a transfer of receivables may be accounted for as a sale if the following three conditions are met: (1) the transferred assets are isolated from the transferor, (2) the transferee has the right to pledge or sell the transferred assets, and (3) the transferor does not maintain control over the transferred assets. Accordingly, the Company recorded the transfer of the accounts receivable as a sale of asset, excluded the related receivables from the Consolidated Balance Sheet and recorded related expenses of $178 for the year ended July 31, 2002. Excluding the accounts receivable sold as part of the divestiture of the videoconferencing hardware services business (see Note 3), no other accounts receivable were sold during the year ended July 31, 2003.

8.      INTANGIBLE ASSETS

Effective August 1, 2001, the Company chose early adoption of SFAS No. 142, "Goodwill and Other Intangibles Assets," which recognizes that since goodwill and certain intangible assets may have indefinite useful lives, these assets are no longer required to be amortized but are to be evaluated at least annually for impairment. In accordance with SFAS No. 142, the Company was required to complete its transitional impairment test, with any resulting impairment loss recorded as a cumulative effect of a change in accounting principle. Subsequent impairment losses are reflected in operating income from continuing operations on the Consolidated Statement of Operations. As a result of adopting of SFAS No. 142, the Company did not record any goodwill amortization expenses during the years ended July 31, 2002 and 2003.

Amortization expenses were $146 in fiscal year 2001. In March 1999, the Company acquired substantially all of the assets of Vosaic LLP, an Internet video software and technology company. The amortization expenses relate to the amortization of goodwill resulting from this acquisition. As required by SFAS No. 142, the results for the prior year have not been restated. A reconciliation of the previously reported net loss and earnings per share as if SFAS No. 142 had been adopted is presented as follows:

|                                | 2001 | 2002 | 2003 |
|--------------------------------|------|------|------|
| Reported net (loss) income     | $ (32,540) | $ (6,103) | $ 8,020 |
| Add back goodwill amortization  | 146 | -- | -- |
| Adjusted net (loss) income     | $ (32,394) | $ (6,103) | $ 8,020 |
| Basic earnings per share:      |      |      |      |
| As reported                    | $ (1.31) | $ (0.25) | $ 0.33 |
| Goodwill amortization          | 0.01 | -- | -- |
| Adjusted earnings per share    | $ (1.30) | $ (0.25) | $ 0.33 |
| Diluted earnings per share:    |      |      |      |
| As reported                    | $ (1.31) | $ (0.25) | $ 0.32 |
| Goodwill amortization          | 0.01 | -- | -- |
| Adjusted earnings per share    | $ (1.30) | $ (0.25) | $ 0.32 |

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

9.    PROPERTY AND EQUIPMENT

Property and equipment and related depreciable useful lives are composed of the following:

| | JULY 31, | |
| --- | --- | --- |
| | 2002 | 2003 |
| Furniture and equipment: 2-5 years | $  6,404 | $   3,070 |
| Internal support equipment: 2-4 years | 868 | 626 |
| Capital leases: lease term or life of the asset | 389 | 410 |
| Leasehold improvements: lease term or life of the improvement | 2,309 | 2,207 |
| | 9,970 | 6,313 |
| Less accumulated depreciation | (6,959) | (4,155) |
| | $  3,011 | $   2,158 |

The amortization of the capital leases is recorded as depreciation expense on the Consolidated Statements of Operations. Depreciation and amortization expense relating to property and equipment was approximately $3,783, $1,477 and $1,061 for the years ended July 31, 2001, 2002 and 2003, respectively.

10.    NOTES PAYABLE

Notes payable at July 31, 2003 consist of the following:

| | 2002 | 2003 |
| --- | --- | --- |
| Note payable to Silicon Valley Bank in monthly installments through July 2006, bearing interest at prime plus 0.75% | $   499 | $   646 |
| Note payable to Global Scheduling Solutions, Inc. subject to "earn-out" provisions through October 31, 2002, bearing no interest | 700 | -- |
| | 1,199 | 646 |
| Less:  current maturities | (899) | (323) |
| Long-term notes payable | $   300 | $   323 |

The note payable to Silicon Valley Bank is secured by a certificate of deposit equal to the $646 balance due as of July 31, 2003.

11.    STOCKHOLDERS' EQUITY

SHARE REPURCHASE PROGRAM

During fiscal years 2002 and 2003, the Company repurchased 788 and 709 shares of its Common Stock for $2,749 and $1,374, respectively. These purchased shares remained in treasury as of the end of fiscal year 2003. The repurchase of stock resulted in an increase in loss per share of $0.01 in fiscal year 2002 and an increase in income per share of $0.02 in fiscal year 2003.

STOCK AND STOCK OPTION PLANS

Forgent has three stock option plans, the 1989 Stock Option Plan (the "1989 Plan"), the 1996 Stock Option Plan (the "1996 Plan") and the 1992 Director Stock Option Plan (the "1992 Plan"). The 1989 Plan and the 1996 Plan both provide for the issuance of non-qualified and incentive stock options to employees and consultants of the Company. Stock options are generally granted at the fair market value at the time of grant, and the options generally vest ratably over 48 months and are exercisable for a period of ten years beginning with date of grant. Effective June 1999, the 1989 Plan expired whereby the Company can no longer grant options under the 1989 Plan; however,

53

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

options previously granted remain outstanding. The 1992 Plan provides for the issuance of stock options to non-employee directors at the fair market value at the time of grant. Such options vest ratably over 36 months and are exercisable for a period of ten years beginning with the date of the grant. Total compensation expense recognized in the Consolidated Statements of Operations for stock based awards was $4, $106, and $216 thousand for fiscal years ending July 31, 2001, 2002, and 2003.

As of July 31, 2003, Forgent had reserved shares of common stock for future issuance under the 1989, 1992 and 1996 Plans as follows:

| | |
|---|---|
| Options Outstanding | 4,268 |
| Options available for future grant | 718 |
| | ===== |
| Shares reserved | 4,986 |

The following table summarizes activity under all Plans for the years ended July 31, 2001, 2002, and 2003.

| | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|
| | SHARES (000'S) | WEIGHTED AVERAGE EXERCISE PRICE | SHARES (000'S) | WEIGHTED AVERAGE EXERCISE PRICE | SHARES (000'S) | WEIGHTED AVERAGE EXERCISE PRICE |
| Outstanding at the beginning of the year | 3,999 | $ 5.39 | 3,613 | $ 4.45 | 3,697 | $ 3.95 |
| Granted | 1,527 | 1.29 | 2,637 | 3.28 | 1,825 | 1.97 |
| Exercised | (3) | 1.10 | (593) | 1.83 | (169) | 1.69 |
| Canceled | (1,910) | 3.88 | (1,956) | 4.63 | (1,085) | 5.69 |
| Outstanding at the end of the year | 3,613 | $ 4.45 | 3,701 | $ 3.94 | 4,268 | $ 2.76 |
| Options exercisable at the year end | 3,563 | $ 4.47 | 3,644 | $ 3.95 | 4,184 | $ 2.77 |
| Weighted average fair value of options granted during the year | | $ 0.95 | | $ 2.19 | | $ 1.97 |

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OUTSTANDING AT JULY 31, 2003 | WEIGHTED-AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED-AVERAGE EXERCISE PRICE | NUMBER EXERCISABLE AT JULY 31, 2003 | WEIGHTED-AVERAGE EXERCISE PRICE |
| $ 0.88 -- $ 1.60 | 682 | 8.10 years | $ 1.28 | 636 | $ 1.28 |
| 1.61 -- 1.61 | 1,039 | 9.21 | 1.61 | 1,039 | 1.61 |
| 1.66 -- 3.04 | 1,150 | 8.61 | 2.74 | 1,125 | 2.77 |
| 3.10 -- 4.00 | 890 | 8.65 | 3.71 | 877 | 3.71 |
| 4.01 -- 20.56 | 507 | 6.27 | 5.44 | 507 | 5.44 |
| $ 0.88 -- $20.56 | 4,268 | 8.41 | $ 2.76 | 4,184 | $ 2.77 |

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

Generally, options are exercisable immediately upon grant. However, stock issued upon exercise of a stock option is subject to repurchase by the Company at the exercise price until the option vesting period has elapsed. At July 31, 2003, options to purchase 1,960 shares were vested. At July 31, 2003, no unvested options had been exercised.

EMPLOYEE STOCK PURCHASE PLAN

On April 29, 1993, Forgent adopted an Employee Stock Purchase Plan ("Employee Plan"), which enables all employees to acquire Forgent stock under the plan. The Employee Plan authorizes the issuance of up to 1,350 shares of Forgent's Common Stock. The Employee Plan allows participants to purchase shares of the Company's Common Stock at a price equal to the lesser of (a) 85% of the fair market value of the Common Stock on the date of the grant of the option or (b) 85% of the fair market value of the Common Stock at the time of exercise. Common Stock issued under the Employee Plan totaled 103 shares, 99 shares, and 178 shares, respectively, for the years ended July 31, 2001, 2002, and 2003.

RESTRICTED STOCK PLAN

On December 17, 1998, the Company adopted a restricted stock plan (the "1998 Plan"). The 1998 Plan authorizes the issuance of up to one million shares of Forgent's Common Stock to be used to reward, incent and retain employees. During fiscal year 2003 the Company issued 19 shares under the 1998 plan with a weighted-average grant date fair market value of $1.94 and resulting in $36 of expense during the year ended July 31, 2003. During fiscal year 2002 the Company issued 115 shares under the 1998 plan with a weighted-average grant date fair market value of $2.64 and resulting in $85 of expense during the year ended July 31, 2002. No shares were issued under the 1998 Plan in fiscal year 2001.

MODIFICATIONS TO OPTIONS

On July 18, 2002, the Company modified the change of control agreements of certain officers of the Company. The original option agreements accelerated the vesting schedule of the officers' unvested options three months for every year of employment in the event of a change of control as defined in the plan. The modified agreements vest all unvested options upon a change of control, regardless of length of service. As of July 18, 2002, the potential charge related to this modification was approximately $591 and will be recognized upon a change of control. As there is no pending or anticipated change of control event, the Company has not recognized a charge. In addition, the maximum severance allowed under the agreements was reduced from 1.8 times annual salary to 1.0 times annual salary.

12.      DEFINED CONTRIBUTION PLAN

The Company sponsors a defined contribution 401(k) plan that is available to substantially all employees. The plan may be amended or terminated at any time by the Board of Directors. The Company, although not required to, has provided matching contributions to the plan of $57, $135 and $83 for the years ended July 31, 2003, July 31, 2002, and July 31, 2001, respectively. These contributions were recorded as expense in the Consolidated Statement of Operations.

13.      REVENUE CONCENTRATION

Thirty-five percent of the Company's total revenue for the year ended July 31, 2003 was generated by one-time intellectual property license agreements with three companies. Fifty-three percent of the Company's total revenue for the year ended July 31, 2002 was generated by one-time intellectual property license agreements with two companies. While the Company does not anticipate any additional intellectual property revenue from these companies, it continues to actively seek licenses with other users of its technology. Additionally, the U.S. patent, which has generated the licensing revenues, expires in October 2006 and its foreign counterparts expire in September 2007.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

14.    EARNINGS (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted earnings (loss) per common share for the years ended July 31, 2001, 2002 and 2003. Approximately 2,613 options, 3,701 options and 2,596 options in fiscal 2001, 2002 and 2003, respectively were not included in the computation of the dilutive stock options because the effect of such options would be anti-dilutive.

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Weighted average shares outstanding – basic | 24,878 | 24,814 | 24,660 |
| Effect of dilutive stock options | -- | -- | 541 |
| Weighted average shares outstanding – diluted | 24,878 | 24,814 | 25,201 |
| Basic (loss) income earnings per share -- from continuing operations | $ (0.20) | $ (0.13) | $ 0.38 |
| Basic loss per share -- from discontinued operations | (1.11) | (0.12) | (0.05) |
| Basic (loss) income earnings per share – total | $ (1.31) | $ (0.25) | $ 0.33 |
| Diluted (loss) income earnings per share -- from continuing operations | $ (0.20) | $ (0.13) | $ 0.37 |
| Diluted loss per share -- from discontinued operations | (1.11) | (0.12) | (0.05) |
| Diluted (loss) income earnings per share – total | $ (1.31) | $ (0.25) | $ 0.32 |

15.    FEDERAL INCOME TAXES

The components of the provision (benefit) for income taxes attributable to continuing operations are as follows for the years ended July 31, 2001, 2002 and 2003:

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| CURRENT: | | | |
| Federal | $ (257) | $ (177) | $ 126 |
| State | (47) | -- | -- |
| Total current | (304) | (177) | 126 |
| DEFERRED: | | | |
| Federal | -- | -- | -- |
| State | -- | -- | -- |
| Total deferred | -- | -- | -- |
| | $ (304) | $ (177) | $ 126 |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant

56

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

components of the Company's deferred taxes at July 31, 2002 and 2003 are as follows:

|  | 2002 | 2003 |
|---|---|---|
| **DEFERRED TAX ASSETS:** | | |
| Net operating loss carryforwards | $ 54,599 | $ 51,012 |
| Research and development credit carryforwards | 6,089 | 6,174 |
| Reserve on investment | 2,208 | 2,087 |
| Minimum tax credit carryforwards | 110 | 280 |
| Fixed assets | -- | 343 |
| Inventory and warranty provisions | 164 | 2 |
| Charitable contributions | 52 | 53 |
| Compensation accruals | 39 | -- |
| Deferred revenue | 367 | 99 |
| Allowance for receivables | 239 | -- |
| Impaired assets | 668 | 503 |
| Other | -- | 248 |
|  | 64,535 | 60,801 |
| **DEFERRED TAX LIABILITIES:** | | |
| Capitalized software | (1,499) | (1,785) |
| Fixed assets | (1,895) | -- |
| Other | (111) | -- |
|  | (3,505) | (1,785) |
| Net deferred tax assets | 61,030 | 59,016 |
| Valuation allowance | (61,030) | (59,016) |
| Net deferred taxes | $    -- | $    -- |

At July 31, 2003, the Company had federal net operating loss carryforwards of approximately $138,000, research and development credit carryforwards of approximately $6,173, and alternative minimum tax credit carryforwards of approximately $280. The net operating loss and credit carryforwards will expire in varying amounts from 2004 through 2021, if not utilized. Minimum tax credit carryforwards do not expire and carry forward indefinitely. Net operating losses related to the Company's foreign subsidiaries of $6,384 are available to offset future foreign taxable income.

As a result of various acquisitions performed by the Company in prior years, utilization of the net operating losses and credit carryforwards may be subject to a substantial annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986. The annual limitation may result in the expiration of net operating losses before utilization.

Due to the uncertainty surrounding the timing of realizing the benefits of its favorable tax attributes in future tax returns, the Company has placed a valuation allowance against its net deferred tax asset. Accordingly, no deferred tax benefits have been recorded for the tax years ended July 31, 2001, 2002, and 2003. The valuation allowance decreased by approximately $2,014 during the year ended July 31, 2003. Approximately $7,858 of the valuation allowance relates to tax benefits for stock option deductions included in the net operating loss carryforward which, when realized, will be allocated directly to contributed capital to the extent the benefits exceed amounts attributable to book deferred compensation expense.

Undistributed earnings of the Company's foreign subsidiaries are considered permanently reinvested and, accordingly, no provision for U.S. federal or state income taxes has been provided thereon.

The Company's provision (benefit) for income taxes attributable to continuing operations differs from the expected tax expense (benefit) amount computed by applying the statutory federal income tax rate of 34% to income before income taxes for the years ended July 31, 2001, 2002, and 2003 primarily as a result of the following:

57

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| Computed at statuory rate | $ (11,167) | $ (2,221) | $ 3,243 |
| State taxes, net of federal benefit | (824) | (163) | 257 |
| Foreign losses not benefited | 813 | 395 | 3 |
| Permanent items | 93 | 21 | 16 |
| RDand AMT credit generated | (399) | (287) | (192) |
| Extraterritorial income benefit | -- | -- | (340) |
| Tax carryforwards not previously benefited | 11,180 | 2,078 | (2,861) |
|  | $ (304) | $ (177) | $ 126 |

16.    COMMITMENTS AND CONTINGENCIES

LEASE COMMITMENTS

Forgent leases computers, furniture, equipment, and office space under non-cancelable leases that expire at various dates through 2013. Certain leases obligate Forgent to pay property taxes, maintenance and insurance. The Company also has several capital leases for computer and office equipment. Additionally, the Company used the proceeds from its notes payable to purchase computers and various equipment.

Future minimum lease payments under all operating and capital leases, and payments on its notes payable, as of July 31, 2003 are as follows:

| FISCAL YEAR ENDING: | OPERATING LEASE OBLIGATIONS | CAPITAL LEASE OBLIGATIONS | NOTES PAYABLE OBLIGATIONS |
|---|---|---|---|
| 2004 | $ 4,349 | $ 49 | $ 351 |
| 2005 | 4,289 | 6 | 231 |
| 2006 | 4,156 | -- | 105 |
| 2007 | 3,447 | -- | -- |
| 2008 | 3,370 | -- | -- |
| Thereafter | 15,525 | -- | -- |
| TOTAL | $ 35,136 | $ 55 | $ 687 |
| Less amount representing interest |  | (5) | (41) |
| Net present value of future minimum payments |  | 50 | 646 |
| Less current portion of obligations |  | (44) | (323) |
| Long-term portion of obligations |  | $ 6 | $ 323 |

The current portion of the capital lease obligations is included in other accrued liabilities on the Consolidated Balance Sheet.

As part of the sale agreement of the products business segment, Forgent assigned the lease for its former manufacturing facility in Austin, Texas to the new company, VTEL Corporation, who assumed all obligations under the existing lease. Therefore, these lease payments are excluded from the minimum operating lease payments presented above. Similarly, the lease payments for the Company's former service sales office in Kennesaw, Georgia are excluded from the minimum operating lease payments since this lease was assigned to Gores as part of the sale of the videoconferencing hardware services business. Gores assumed all obligations under this existing lease. Forgent may periodically make other commitments and thus become subject to other contractual obligations. However, management believes these commitments and contractual obligations are routine in nature and incidental to the Company's operations.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

Total rent expense under all operating leases for the years ended July 31, 2001, 2002 and 2003 was $4,848, $3,497, and $1,399, respectively. During the years ended July 31, 2001, 2002, and 2003, the Company received $920, $708, and $585 respectively, in rental income under sub-leasing arrangements. These amounts offset against rental expense in the Consolidated Statements of Operations. At July 31, 2003, future minimum lease payments receivable under non-cancelable sub-lease arrangements totaled $3,199 for all future years and sub-tenant deposits totaled $141.

As of July 31, 2003, the Company had a $835 liability remaining on its books related to a Tenant Improvement Allowance that was paid to the Company by the landlord for its Wild Basin property in Austin, Texas. The liability is amortized monthly as a reduction in rental expense over the life of the lease on a straight-line basis. Approximately $748 of this liability is reported as part of long-term liabilities on the Company's Consolidated Balance Sheet.

As of July 31, 2003, Forgent had a $1,360 liability related to impairment charges for the economic value of the lost sublease rental income at its properties in Austin, Texas, King of Prussia, Pennsylvania, and Atlanta, Georgia. The liability is amortized monthly as a reduction in rental expense based on the difference between the actual subtenant rental income and the expected subtenant rental income. Approximately $593 of this liability is reported as part of long-term liabilities on the Company's Consolidated Balance Sheet.

CONTINGENCIES

The Company is the defendant or plaintiff in various actions that arose in the normal course of business. In the opinion of management, the ultimate disposition of these matters will not have a material adverse affect on the Company's financial condition, results of operation or cash flows.

In late February 2003, the Company received a letter from legal counsel for the independent executrix of the Estate of Gordon Matthews, asserting that the Company was obligated to pay the independent executrix of the Estate of Gordon Matthews for the asserted value of services claimed to have been rendered by Mr. Matthews in connection with his alleged involvement in the Company's Patent Licensing Program. In late February 2003, the Company initiated an action in the 261st District Court in Travis County Texas, styled Forgent Networks, Inc. v. Monika Matthews, et al, for the purposes of declaring that the Company has no obligation to the defendant. In that action, the defendant has filed a counter claim asserting that the independent executrix of the Estate of Gordon Matthews is entitled to recover in quantum meruit for the reasonable value of the work and services claimed to have been provided by Gordon Matthews, a former member of the board of directors and consultant to the Company, which the defendant asserts is at least $5.0 million. The Company does not believe the counter claim has merit and intends to continue to vigorously pursue declaratory relief from the court that no liability is due to the independent executrix of the Estate of Gordon Matthews.

17.    SEGMENT INFORMATION

In the past, Forgent managed its business primarily along the lines of three reportable segments: Solutions, Products, and Internet Ventures. The Solutions segment provided a wide variety of maintenance, network consulting and support services to customers, and designed and installed custom integrated visual communication systems primarily in meetings spaces of large corporations. In April 2002, the Company sold its integration business within this segment and in July 2003, the Company sold its videoconferencing hardware services business within this segment. Thus, the entire Solutions segment is accounted for as discontinued operations in the consolidated financial statements. The Products segment designed, manufactured, and sold multi-media visual communication products to customers primarily through a network of resellers, and to a lesser extent directly to end-users. As a result of the sale of the Products segment in January 2002, the Products segment is also accounted for as discontinued operations in the consolidated financial statements. The Internet Ventures included OnScreen24(TM), which delivered and marketed visual communication tools for the Internet and ArticuLearn(TM), an e-learning portal provider for commercial and educational businesses that delivered learning content in a web environment. OnScreen24's operations were folded back into the core businesses as of January 31, 2001 and ArticuLearn's operations were terminated as of June 30, 2001.

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT FOR SHARE DATA OR OTHERWISE NOTED)

Currently, the Company operates in two distinct segments: software and professional services, and intellectual property licensing. Forgent's software and professional services business provides customers with enterprise meeting automation software as well as software customization, installation, training, network consulting, hardware devices, and other comprehensive related services. Forgent's intellectual property licensing business is currently focused on generating licensing revenues relating to the Company's data compression technology embodied in U.S. Patent No. 4,698,672 and its foreign counterparts. The accounting policies of the segments are the same as those described in Note 2.

The Company evaluates the performance as well as the financial results of its segments. Included in the segment operating income (loss) is an allocation of certain corporate operating expenses. The prior years' segment information has been restated to present the Company's reportable segments as they are currently defined. The Company does not identify assets or capital expenditures by reportable segments. Additionally, the Chief Executive Officer and Chief Financial Officer do not evaluate the segments based on these criteria.

Revenue and cost of sales for each of the reportable segments are disclosed in the Consolidated Statements of Operations. Goodwill associated with specific segments is as follows:

|  | FOR THE YEARS JULY 31, | |
|  | 2002 | 2003 |
| --- | --- | --- |
| Software and professional services | $ 6,894 | $ 5,042 |
| Intellectual property licensing | -- | -- |
| Total | $ 6,894 | $ 5,042 |

Revenue and long-lived assets related to operations in the United States and foreign countries for the three fiscal years ended July 31, 2003 are presented below. Revenues generated between foreign geographic locations have historically been insignificant.

|  | FOR THE YEARS ENDED JULY 31, | | |
|  | 2001 | 2002 | 2003 |
| --- | --- | --- | --- |
| Revenue from unaffiliated customers: | | | |
| United States | $ 103 | $ 2,164 | $ 5,894 |
| Foreign | -- | 31,222 | 47,970 |
| Long-lived assets at the end of year: | | | |
| United States | $ 9,745 | $ 13,857 | $ 12,257 |
| Foreign | -- | -- | -- |

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

18.    QUARTERLY INFORMATION (UNAUDITED)

The following tables contain selected unaudited consolidated statements of operations and earnings (loss) per share data for each quarter during fiscal years 2003 and 2002.

| | FOR THE THREE MONTHS ENDED | | | |
| | OCT. 31, 2002 | JAN. 31, 2003 | APRIL 30, 2003 | JULY 31, 2003 |
|---|---|---|---|---|
| Total revenues, as reported | $ 12,531 | $ 12,501 | $ 17,107 | $ 24,301 |
| Service revenue – discontinued operations in fourth fiscal quarter of 2003 | (4,723) | (4,127) | (3,726) | – |
| Restated total revenues | $ 7,808 | $ 8,374 | $ 13,381 | $ 24,301 |
| Gross margin from continuing operations, as reported | $ 5,186 | $ 5,420 | $ 7,297 | $ 11,720 |
| Service margin – discontinued operations in fourth fiscal quarter of 2003 | (1,600) | (1,451) | (1,014) | – |
| Restated gross margin from continuing operations | $ 3,586 | $ 3,969 | $ 6,283 | $ 11,720 |
| Gross margin from discontinued operations | 1,600 | 1,451 | 1,014 | (195) |
| Net income | $ 925 | $ 1,315 | $ 1,723 | $ 4,057 |
| Basic income per share | $ 0.04 | $ 0.05 | $ 0.07 | $ 0.17 |
| Diluted income per share | $ 0.04 | $ 0.05 | $ 0.07 | $ 0.16 |

| | FOR THE THREE MONTHS ENDED | | | |
| | OCT. 31, 2001 | JAN. 31, 2002 | APRIL 30, 2002 | JULY 31, 2002 |
|---|---|---|---|---|
| Total revenues, as reported | $ 6,668 | $ 8,018 | $ 22,317 | $ 17,076 |
| Service revenue – discontinued operations in fourth fiscal quarter of 2003 | (6,586) | (7,643) | (6,464) | – |
| Restated total revenues | $ 82 | $ 375 | $ 15,853 | $ 17,076 |
| Gross margin from continuing operations, as reported | $ 2,332 | $ 762 | $ 11,708 | $ 8,350 |
| Service margin – discontinued operations in fourth fiscal quarter of 2003 | (2,443) | (3,189) | (2,866) | – |
| Restated gross margin from continuing operations | $ (111) | $ (2,427) | $ 8,842 | $ 8,350 |
| Gross margin from discontinued operations | 6,114 | 4,364 | 2,887 | 1,181 |
| Net (loss) income | $ (2,570) | $ (8,553) | $ 2,481 | $ 2,539 |
| Basic (loss) income per share | $ (0.10) | $ (0.34) | $ 0.10 | $ 0.09 |
| Diluted (loss) income per share | $ (0.10) | $ (0.34) | $ 0.10 | $ 0.09 |

19.    SUBSEQUENT EVENT (UNAUDITED)

As approved by each company's board of directors and finalized on October 6, 2003, Forgent acquired certain assets and the operations of Network Simplicity Software Inc. ("Network Simplicity"), a privately held provider of web-based scheduling solutions for the small to medium business market. Network Simplicity's flagship product, Meeting Room Manager (TM), is a scheduling application designed for the ease of use and rapid deployment across small to medium sized businesses and complements Forgent's current ALLIANCE software

FORGENT NETWORKS, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA OR OTHERWISE NOTED)

suite, which is focused on the high-end enterprises. Additionally, Network Simplicity's distribution model is based on telesales and web-based sales, which also complement ALLIANCE's direct distribution model. Forgent purchased Network Simplicity for approximately $3,500, consisting of $1,800 in cash, $200 in escrow for representations and warrants and $1,500 in payments tied to certain future contingencies. Additionally, Forgent paid Network Simplicity approximately $159 for its existing working capital as of October 6, 2003. This acquisition allows the Company to extend its current enterprise software product offerings and to expand its market opportunities into the small to medium business market.

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
           FINANCIAL DISCLOSURE

The Company had no disagreements on accounting or financial disclosure
matters with its independent accountants to report under this Item 9.


ITEM 9A.    CONTROLS AND PROCEDURES

The Company maintains disclosure controls and procedures that are
designed to ensure that information required to be disclosed in the reports it
files under the Securities and Exchange Act of 1934, as amended, is recorded,
processed, summarized, and reported within the time periods specified in the
Securities and Exchange Commission's rules and forms. Such controls include
those designed to ensure that information for disclosure is communicated to
management, including the Chairman of the Board and the Chief Executive Officer
("CEO"), as appropriate to allow timely decisions regarding required disclosure.

The CEO and Chief Financial Officer, with the participation of
management, have evaluated the effectiveness of the Company's disclosure
controls and procedures as of July 31, 2003. Based on their evaluation, they
have concluded, to the best of their knowledge and belief, that the disclosure
controls and procedures are effective. No changes were made in the Company's
internal controls over financial reporting during the year ended July 31, 2003,
that have materially affected, or are reasonably likely to materially affect,
the Company's internal controls over financial reporting.


PART III


ITEM 10.    DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

63

Information contained under the caption "Election of Directors" in the Proxy Statement is incorporated herein by reference in response to this Item 10. See Item 1. "Business - Executive Officer" for information concerning executive officers.

Information regarding Forgent's code of ethics contained under the caption "Policies on Business Ethics and Conduct" in the Proxy Statement is incorporated herein by reference in response to this Item 10.

Information regarding Forgent's Audit Committee Financial Expert is contained under the caption "Report of the Audit Committee" in the Proxy Statement is incorporated herein by reference in response to this Item 10.

ITEM 11.    EXECUTIVE COMPENSATION

Information contained under the captions "Executive Compensation" and "Election of Directors" in the Proxy Statement is incorporated herein by reference in response to this Item 11.

ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Information contained under the caption "Stock Ownership of Certain Beneficial Owners and Management" in the Proxy Statement is incorporated herein by reference in response to this Item 12.

Information contained under the caption "Equity Compensation Plans" in the Proxy Statement is incorporated herein by reference in response to this Item 12.

ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Information contained under the caption "Certain Transactions" in the Proxy Statement is incorporated herein by reference in response to this Item 13.

ITEM 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES

Information contained under the caption "Fees" in the Proxy Statement is incorporated herein by reference in response to this Item 14.

PART IV

ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(1) The following Consolidated Financial Statements of the Company and Report of Independent Accountants as set forth in Item 8 of this report are filed herein.

CONSOLIDATED FINANCIAL STATEMENTS

Consolidated Balance Sheets as of July 31, 2002 and 2003.

Consolidated Statements of Operations for the years ended July 31, 2001, 2002, and 2003.

Consolidated Statements of Changes in Shareholders' Equity for the years ended July 31, 2001, 2002, and 2003.

Consolidated Statements of Cash Flows for the years ended July 31, 2001, 2002, and 2003.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

REPORT OF INDEPENDENT AUDITORS

(2) All other schedules for which provision is made in the applicable account regulation of the Securities and Exchange Commission are either not required under the related instructions, are inapplicable, or the required information is included elsewhere in the Consolidated Financial Statements and incorporated herein by reference.

(3) The exhibits filed in response to Item 601 of Regulations S-K are listed in the Index to the Exhibits.

(4) The Company filed the following reports on Form 8-K:

On May 29, 2003, the registrant filed a report on Form 8-K announcing its financial results for the quarter ended April 30, 2003.

On July 3, 2003 the registrant filed a report on Form 8-K announcing the sale of its videoconferencing hardware services business.

<center>65</center>

<center>SIGNATURES</center>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

FORGENT NETWORKS, INC.

October 29, 2003                    By  /s/ RICHARD N. SNYDER
                                        ------------------------------
                                        Richard N. Snyder
                                        Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant and in the capacities and on the date indicated.

| SIGNATURE | TITLE | DATE |
|-----------|-------|------|
| /s/  RICHARD N. SNYDER<br>----------------------------------<br>Richard N. Snyder | Chief Executive Officer<br>Chairman of the Board<br>(Principal Executive Officer) | October 29, 2003 |
| /s/  JAY C. PETERSON<br>----------------------------------<br>Jay C. Peterson | Chief Financial Officer<br>Vice-President – Finance and Treasurer<br>(Principal Financial Officer and<br>Principal Accounting Officer) | October 29, 2003 |
| /s/  RICHARD AGNICH<br>----------------------------------<br>Richard Agnich | Director | October 29, 2003 |
| /s/  KATHLEEN A. COTE<br>----------------------------------<br>Kathleen A. Cote | Director | October 29, 2003 |
| /s/  LOU MAZZUCCHELI<br>----------------------------------<br>Lou Mazzuccheli | Director | October 29, 2003 |
| /s/  RAY MILES<br>----------------------------------<br>Ray Miles | Director | October 29, 2003 |
| /s/  JAMES H. WELLS<br>----------------------------------<br>James H. Wells | Director | October 29, 2003 |

<center>66</center>

FORGENT NETWORKS, INC.
VALUATION AND QUALIFYING ACCOUNTS
SCHEDULE II

| | BALANCE AT BEGINNING OF YEAR | PROVISION FOR DOUBTFUL ACCOUNTS RECEIVABLE | WRITE-OFF OF UNCOLLECTIBLE ACCOUNTS RECEIVABLE | BALANCE AT END OF YEAR |
|---|---|---|---|---|
| | | | (IN THOUSANDS) | |
| Accounts receivable - Allowances for Doubtful accounts | | | | |
| Year ended July 31, 2001 | 888 | 468 (1) | (267) (1) | 1,089 |
| Year ended July 31, 2002 | 1,089 | 1,355 (1) | (1,629) (1) | 815 |
| Year ended July 31, 2003 | 815 | 460 (2) | (1,275) (3) | -- |

(1) All of the activity relates to Forgent's discontinued products, integration, and videoconferencing hardware services operations.

(2) Approximately $51 of the provision for doubtful accounts receivable was recorded as part of continuing operations and $409 of the provision for doubtful accounts receivable was recorded as part of discontinued operations on the Consolidated Statement of Operations.

(3) Approximately $703 of the write-offs relate to the Allowance for Doubtful Accounts that was sold to Gores as part of the sale of the videoconferencing hardware services business. None of the remaining $572 in write-offs relate to Forgent's continuing software and professional services or intellectual property operations.

INDEX TO EXHIBITS

| EXHIBIT NUMBER | | DOCUMENT DESCRIPTION |
|---|---|---|
| (a)(1) | -- | The financial statements filed as part of this Report at Item 8 are listed in the Index to Financial Statements and Financial Statement Schedules on page 43 of this Report |
| (a)(2) | -- | The financial statement schedule filed as part of this Report at Item 8 is listed in the Index to Financial Statements and Financial Statement Schedules on page 43 of this Report |
| (a)(3) | -- | The following exhibits are filed with this Annual Report on Form 10-K: |
| 2.1 | -- | Agreement and Plan of Merger and Reorganization dated as of January 6, 1997 by and among VTEL, VTEL-Sub, Inc. and CLI (incorporated by reference to the Exhibit 99.1 of VTEL's Report on Form 8-K dated January 6, 1997). |
| 3.1 | -- | Fourth Amended Restated Certificate of Incorporation (incorporated by reference the Exhibit 3.1 to the Company's quarterly report form 10-Q for the period ended June 30, 1993). |
| 3.2 | -- | Amendment to Fourth Amended and Restated Certificate of Incorporation, as filed on May 27, 1997 with the Secretary of State of Delaware (incorporated by reference the Exhibit 3.1 to the Company's Annual Report on form 10-K for the period ended July 31, 1997). |
| 3.3 | -- | Bylaws of the Company as adopted by the Board of Directors of the Company effective as of June 11, 1989 (incorporated by reference to Exhibit 3.3 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |

1

| | | |
|---|---|---|
| 3.4 | -- | Amendment to Bylaws of the Company as adopted by the Board of Directors of the Company effective as of April 28, 1992 (incorporated by reference to Exhibit 19.1 to the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 1992). |
| 3.5 | -- | Amendment to the Bylaws of the Company as adopted by the Board of Directors of the Company effective as of July 10, 1996 (incorporated by reference to Exhibit 4.5 to the Company's Current Report on Form 8-K dated July 10, 1996). |
| 4.1 | -- | Specimen Certificate for the Common Stock (incorporated by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 4.2 | -- | Rights Agreement dated as of July 10, 1996 between VTEL Corporation and First National Bank of Boston, which includes the form of Certificate of Designations for Designating Series A Preferred Stock, $.01 par value, the form of Rights Certificate, and the Summary of Rights to Purchase Series A Preferred Stock (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated July 10, 1996). |
| 10.1 | -- | License Agreement, dated as of November 7, 1990, between Universite de Sherbrooke, as Licenser, and the Company, as Licensee (incorporated by reference to Exhibit 10.5 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.2 | -- | VideoTelecom Corp. 1989 Stock Option Plan, as amended (incorporated by reference to Exhibit 4.1 to the Company's Registration on Form S-8, File No. 33-51822). |
| 10.3 | -- | Form of VideoTelecom Corp. Nonqualified Stock Option Agreement (incorporated by reference to Exhibit 10.16 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.4 | -- | Form of VideoTelecom Corp. Incentive Stock Option Agreement (incorporated by reference to Exhibit 10.17 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.5 | -- | Distributor Agreement dated January 8, 1990, between US WEST Communications Services, Inc. and the Company (incorporated by reference to Exhibit 10.18 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.6 | -- | Purchase Agreement effective October 1, 1990, between GTE Service Corporation and the Company, as amended July 1, 1991 (incorporated by reference to Exhibit 10.19 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.7 | -- | Distribution Agreement, made and entered into November 1, 1991, by and between Microsoft Corporation and the Company (incorporated by reference to Exhibit 10.22 to the Company's Registration Statement on Form S-1, File No. 33-45876, as amended). |
| 10.8 | -- | VideoTelecom Corp. 1992 Director Stock Option Plan (incorporated by reference to Exhibit 4.1 to the Company's Registration on Form S-8, File No. 33-51822). |
| 10.9 | -- | VideoTelecom Corp. Employee Stock Purchase Plan (incorporated by reference to Exhibit 4.1 to the Company's Registration on Form S-8, File No. 33-51822). |
| 10.10 | -- | Lease agreement, executed by Waterford HP, Ltd. on June 14, 1994, as Landlord, and the Company, as Tenant, together with First Amendment of Lease Agreement between Waterford HP, Ltd., as Landlord, and the Company, as Tenant, dated November 2, 1994, Second Amendment of Lease Agreement between Waterford HP, Ltd., as Landlord, and the Company, as Tenant, dated February 1, 1995, and Net Profits Agreement, executed between Waterford HP, Ltd. on June 14, |

|          |     |                                                                                                                                                                                                                                                                                                                                                                                                             |
|----------|-----|-----------|

1994 and the Company (incorporated by reference to Exhibit 10.17 to the Company's 1994 Annual Report on Form 10-K).

10.11   --   Subscription Agreement dated June 14, 1995 by and between VTEL Corporation, Accord Video Telecommunications, Ltd., Nizanim Fund (1993) Ltd., the "Star Entities", Manakin Investments BV, Messrs. Gideon Rosenfeld and Sigi Gavish, and Eduardo Shoval (incorporated by reference to Exhibit 10.19 to the Company's 1995 Annual Report on Form 10-K. The schedules referred to in the agreement have been omitted but will be furnished to the Securities and Exchange Commission upon request).

10.12   --   Amendment to the VideoTelecom Corp. 1989 Stock Option Plan and the 1992 Director Stock Option Plan (the terms of which are incorporated by reference to the Company's 1996 Definitive Proxy Statement).

10.13   --   The VTEL Corporation 1996 Stock Option Plan (the terms of which are incorporated by reference to the Company's 1995 Definitive Proxy Statement).

10.14   --   Amendment to the VTEL Corporation 1996 Stock Option Plan (the terms of which are incorporated by reference to the Company's Joint Proxy Statement filed on April 24, 1997).

10.15   --   Compression Labs, Incorporated 1980 Stock Option Plan - the ISO Plan (incorporated by reference to the Annual Report on Form 10-K of Compression Labs, Inc. for the year ended December 31, 1994).

10.16   --   Revised forms of Incentive Stock Option and Early Exercise Stock Purchase Agreement used in connection with the issuance and exercise of options under the ISO Plan (incorporated by reference to the Registration Statement on Form S-8 of Compression Labs, Inc. filed on June 6, 1994).

10.17   --   Consulting and separation agreement between Compression Labs, Incorporated and John E. Tyson dated February 16, 1996 (incorporated by reference to the Annual Report on Form 10-K of Compression Labs, Inc. for the year ended December 31, 1995).

10.18   --   Lease Agreement, dated January 30, 1998, between 2800 Industrial, Inc., Lessor and VTEL Corporation, Lessee (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the three months ended April 30, 1998).

10.19   --   First Amendment, dated March 11, 1998, to Lease Agreement dated January 30, 1998, between 2800 Industrial, Inc., Lessor and VTEL Corporation, Lessee (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the three months ended April 30, 1998).

10.20   --   The VTEL Corporation 1998 Restricted Stock Plan (the terms of which are incorporated by reference to the Company's 1998 Definitive Proxy Statement).

10.21   --   Loan and Security Agreement, dated May 5, 1999, between Silicon Valley Bank and Comerica Bank-Texas, as Creditors, and the Company, as Borrower. (incorporated by reference to Exhibit 10.21 to the Company's Annual Report on Form 10-K for the fiscal year ended July 31, 1999)

10.22   --   Change-in-Control Agreements with members of senior management of the Company (incorporated by reference to Exhibit 10.21 to the Company's Annual Report on Form 10-K for the year ended July 31, 1998)

10.22(a)   --   Stephen L. Von Rump

10.22(b)   --   Rodney S. Bond

| | | |
|---|---|---|
| 10.22(c) | -- | Dennis M. Egan |
| 10.22(d) | -- | Vinay Goel |
| 10.22(e) | -- | Steve F. Keilen |
| 10.22(f) | -- | F.H. (Dick) Moeller |
| 10.22(g) | -- | Ly-Huong T. Pham |
| 10.22(h) | -- | Michael J. Steigerwald |
| 10.22(i) | -- | Bob R. Swem |
| 10.22(j) | -- | Judy A. Wallace |
| 10.23 | -- | Change-in Control Agreements with members of senior management of the Company (incorporated by reference to exhibit 10.1 to the Company's Annual Report on Form 10-Q for the quarter ended January 31, 2000) |
| 10.23(a) | -- | Brian C. Sullivan |
| 10.23(b) | -- | Stephen Cox |
| 10.23(c) | -- | Stephen Von Rump (amended) |
| 10.24 | | Officer and Director Stock Loan Program (incorporated by reference to Exhibit 10.24 to the Company's Annual Report on Form 10-K/A for the year ended July 31, 2002) |
| 21.1 | -- | List of Subsidiaries |
| 23.1 | -- | Consent of Ernst &Young LLP |
| 31.1 | -- | Certification pursuant to Section 302 of Sarbanes-Oxley Act of 2002 |
| 31.2 | -- | Certification pursuant to Section 302 of Sarbanes-Oxley Act of 2002 |
| 32.1 | -- | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | -- | Certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

4

</TEXT>
</DOCUMENT>

EXHIBIT 21.1

Forgent Networks Inc.
List of Subsidiaries

| Subsidiary | Location |
|------------|----------|
| Compression Labs, Incorporated | Delaware |
| Forgent – GSS, Inc. | Delaware |
| Articulearn, Inc. | Delaware |
| OnScreen24 Corp. | Delaware |
| VTEL Australia, PTY LTD | Australia |
| CLI NV Belgium | Belgium |
| VTEL Brazil, Ltda | Brazil |
| VTEL France, SA | France |
| VTEL Germany, GmbH | Germany |
| VTEL Europe, LTD | United Kingdom |

</TEXT>
</DOCUMENT>

EXHIBIT 23.1

CONSENT OF INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements
pertaining to various employee benefit plans of Forgent Networks, Inc. (Form S-8
Nos. 333-77733, 333,44533, 333-48885, 333-28499, 333-51822, 333-64212,
333-65472, 333-65464, 333-95754 and 333-65478) of our report dated September 9,
2003, with respect to the amended consolidated financial statements and schedule
of Forgent Networks, Inc. included in its Annual Report (Form 10-K/A-2) for the
year ended July 31, 2002.

/s/ Ernst & Young LLP

Austin, Texas
October 29, 2003

5

</TEXT>
</DOCUMENT>

EXHIBIT 31.1

CERTIFICATION OF PERIODIC REPORT
PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, the undersigned Richard N. Snyder, Chief Executive Officer, of Forgent
Networks, Inc. (the "Company"), certify that:

1.  I have reviewed the Annual Report on Form 10-K of the Company
    for the fiscal year ended July 31, 2003 (the "Report");

2.  Based on my knowledge, the Report does not contain any untrue
    statement of a material fact or omit to state a material fact
    necessary in order to make the statements made, in light of
    the circumstances under which such statements were made, not
    misleading with respect to the periods covered by this Report;

3.  Based on my knowledge, the financial statements, and other
    financial information included in the Report, fairly present
    in all material respects the financial condition, results of
    operations and cash flows of the Company as of, and for, the
    periods presented in the Report;

4.  The Company's other certifying officer and I are responsible
    for establishing and maintaining disclosure controls and
    procedures (as defined in Exchange Act Rules 13a-15(e) and
    15d-15(e)) for the Company and we have (a) designed such
    disclosure controls and procedures, or caused such disclosure
    controls and procedures to be designed under our supervision,
    to ensure that material information relating to the Company,
    including its consolidated subsidiaries, is made known to us
    by others within these entities, particularly during the
    period in which the Report is being prepared; (b) evaluated
    the effectiveness of the Company's disclosure controls and
    procedures and presented in the Report our conclusions about
    the effectiveness of the disclosure controls and procedures,
    as of the end of the period covered by the Report based on
    such evaluation; and (c) disclosed in the Report any change in
    the Company's internal control over financial reporting that
    occurred during the Company's most recent fiscal quarter (the
    quarter ended July 31, 2003) that has materially affected, or
    is reasonably likely to materially affect, the Company's
    internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed,
    based on our most recent evaluation of internal controls over
    financial reporting, to the Company's auditors and to the
    Audit Committee of the Board of Directors: (a) all significant
    deficiencies or material weaknesses in the design or operation
    of internal controls over financial reporting which are
    reasonably likely to adversely affect the Company's ability to
    record, process, summarize and report financial information;
    and (b) any fraud, whether or not material, that involves
    management or other employees who have a significant role in
    the Company's internal controls.

                        /s/ RICHARD N. SNYDER
                        ----------------------------------------
                        Richard N. Snyder
                        Chief Executive Officer
                        October 29, 2003

                                 6

</TEXT>
</DOCUMENT>

EXHIBIT 31.2

CERTIFICATION OF PERIODIC REPORT
PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, the undersigned, Jay C. Peterson, Chief Financial Officer, of Forgent Networks, Inc. (the "Company"), certify, that:

1.  I have reviewed the Annual Report on Form 10-K of the Company for the fiscal year ended July 31, 2003 (the "Report");

2.  Based on my knowledge, the Report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this Report;

3.  Based on my knowledge, the financial statements, and other financial information included in the Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and we have (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within these entities, particularly during the period in which the Report is being prepared; (b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in the Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by the Report based on such evaluation; and (c) disclosed in the Report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the quarter ended July 31, 2003) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over financial reporting, to the Company's auditors and to the Audit Committee of the Board of Directors: (a) all significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

/s/ JAY C. PETERSON
----------------------------------------
Jay C. Peterson
Chief Financial Officer
October 29, 2003

1

</TEXT>
</DOCUMENT>

EXHIBIT 32.1

CERTIFICATION OF PERIODIC REPORT
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, the undersigned, Richard N. Snyder, Chief Executive Officer, of Forgent Networks, Inc. (the "Company"), does hereby certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

    1.    The Annual Report on Form 10-K of the Company for the fiscal year ended July 31, 2003 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 as amended (15 U.S.C. 78m or 78o(d)), and

    2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ RICHARD N. SNYDER
----------------------------------------
Richard N. Snyder
Chief Executive Officer
October 29, 2003

2

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

EXHIBIT 32.2

CERTIFICATION OF PERIODIC REPORT
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, the undersigned, Jay C. Peterson, Chief Financial Officer, of Forgent
Networks, Inc. (the "Company"), does hereby certify, pursuant to Section 906 of
the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that:

1.      The Annual Report on Form 10-K of the Company for the fiscal
year ended July 31, 2003 (the "Report") fully complies with
the requirements of section 13(a) or 15(d) of the Securities
Exchange Act of 1934 as amended (15 U.S.C. 78m or 78o(d)), and

2.      The information contained in the Report fairly presents, in
all material respects, the financial condition and results of
operations of the Company.

/s/ JAY C. PETERSON
----------------------------------------
Jay C. Peterson
Chief Financial Officer
October 29, 2003

3

</TEXT>
</DOCUMENT>

Created by 10KWizard Technology    www.10KWizard.com