**Compression Labs, Incorporated v. Agfa Corporation et al.,**
**C.A. No. 2:04CV-158 DF**

**Motion to Dismiss Under Fed. R. Civ. P. 12(b)(7), or,**
**in the Alternative, Motion to Transfer**

**Attachment F to the**
**Declaration of Joseph M. Casino**

CONFIDENTIAL

## LICENSE AND CO-OWNERSHIP AGREEMENT

THIS LICENSE AND CO-OWNERSHIP AGREEMENT is made and entered into as of this 24th day of June , 1996 (the "Effective Date") by and between COMPRESSION LABS, INCORPORATED, a Delaware corporation with principal offices at 2860 Junction Avenue, San Jose, California 95134 ("CLI"), and CHARGER INDUSTRIES, INC., a California corporation with principal offices at 6262 Lusk Boulevard, San Diego, CA 92121 ("Charger").

In consideration of the promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

### AGREEMENT

1. **DEFINITIONS.**

    1.1    "**Affiliate**" has the meaning defined for such term in the Purchase Agreement.

    1.2    "**BPG**" means CLI's Broadcast Products Group.

    1.3.    "**CLI Field of Use**" means the videoconferencing business as it is currently conducted by CLI and as such business evolves in the future.

    1.4.    "**CLI Intellectual Property Rights**" means the Intellectual Property Rights enumerated on Exhibit A.

    1.5.    "**Charger Field of Use**" means the broadcasting business as it has historically been conducted by CLI and as such business evolves in the future.

    1.6.    "**Charger Intellectual Property Rights**" means the Intellectual Property Rights enumerated on Exhibit B.

    1.7.    "**Confidential Information**" means any confidential or proprietary information, source code, software tools, designs, schematics, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party, its present or future products, sales, suppliers, customers, employees, investors or business, identified by the disclosing party as Confidential Information, whether in oral, written, graphic or electronic form. If disclosed in oral form, such Confidential Information must be reduced to writing and marked as Confidential Information within thirty (30) days following disclosure.   Without limiting the foregoing, all CLI Intellectual Property Rights and all Charger Intellectual Property Rights shall be deemed the Confidential Information of their respective owner.

    1.8    "**Customers**" means resellers, distributors, end users and other parties in the chain of distribution.

**1.9.**    **"Intellectual Property Rights"** means the Patent Rights, know how and trade secrets of a party.

**1.10.**    **"Jointly Owned Patents"** means those Patent Rights enumerated in Exhibit C.

**1.11**    **"Marks"** shall have the meaning for such term set forth in Section 5.

**1.12.**    **"Patent Rights"** means a patent or patent application and all foreign counterparts, substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations and continuations in part relating to such patents or patent applications.

**1.13.**    **"Products"** means any product or service used, exercised, made, offered for sale, sold or imported by a party hereto that falls within the scope of the Intellectual Property Rights of the other party or the Jointly Owned Patents.

**1.14**    **"Purchase Agreement"** means the Asset Purchase Agreement between CLI and Charger dated June 7, 1996.

**2.**    **JOINTLY OWNED PATENTS.**

**2.1.**    **Joint Ownership.**  CLI hereby assigns to Charger an undivided one-half (½) interest in the Jointly Owned Patents so that the parties are joint owners of the Jointly Owned Patents without any right of accounting.  Both parties agree that they may use the Jointly Owned Patents in any way, subject to the field of use restrictions set forth in Section 2.2.

**2.2.**    **Restriction on Use.**  Charger shall have the right to practice the Jointly Owned Patents only in the Charger Field of Use.  CLI shall have the right to practice the Jointly Owned Patents only in any field of use other than the Charger Field of Use.  In the event that a party grants a license under the Jointly Owned Patents to a third party, the licensing party agrees to execute an agreement with its licensee that binds the licensee (and its sublicensees, if any) to the field of use limitations enumerated in this Section 2.2.  This Section 2.2 shall terminate with respect to each Jointly Owned Patent upon the expiration of such Jointly Owned Patent or when there is a final determination of invalidity by a court of competent jurisdiction.  The restrictions on the practice of a Jointly Owned Patent set forth in this Section shall only apply in the country in which such patent is valid and enforceable.  Notwithstanding anything in this Agreement to the contrary, after the Effective Date, a party may assign its interest in a Jointly Owned Patent (subject to the restrictions and obligations set forth in this Agreement), but only in whole, not in part.

**2.3.**    **Convergence.**  The parties acknowledge the possibility that the parties' respective fields of use may converge as their respective industries and technologies evolve over time.  As a result, to the extent that the Charger Field of Use and the fields of use other than the Charger Field of Use converge in the future due to industry or technology evolution, the restrictions on use set forth in Section 2.2, as they relate to both parties, shall not apply to the extent of the convergence.

CONFIDENTIAL

**2.4.    Maintenance.**  The parties will each pay 50% of the maintenance costs of all jointly Owned Patents.  If one party refuses to pay such maintenance costs, the other party can pay the costs and bill the refusing party for its share.

**2.5    Infringement.**  If either party learns of a third party infringement of a Jointly owned Patent, that party shall promptly notify the other party of such fact.  The parties shall then mutually agree on how to proceed with an enforcement action, including without limitation actions for past infringement of the Jointly Owned Patents occurring prior to the Effective Date.  If the parties cannot agree, then if the infringement is limited to (1) Charger's Field of Use, Charger shall have the right to control the enforcement action, and (2) a field of use other than the Charger Field of Use, CLI shall have the right to control the enforcement action.  The recovery from the enforcement action shall be split in proportion to the parties' contribution to the enforcement action's costs (including without limitation attorneys' fees).  In the event that a party hereto declines to participate in an enforcement action, such party agrees, at the participating party's expense, to join the action as a party plaintiff and otherwise cooperate with the enforcement action in any way reasonably requested by the participating party.

**2.6.    Settlement.**  Neither party shall enter into a settlement with a potential or actual infringer of a Jointly Owned Patent that interferes with or adversely affects the rights of the other party without such other party's prior written consent.

**2.7.    Declaratory Action.**  In the event that a third party initiates an action for declaratory judgment related to a Jointly Owned Patent, the general principles specified in Sections 2.5 and 2.6 shall apply with respect to control of the defense, costs and settlement.

**2.8.    Proprietary Rights Notices.**  Each party will cooperate to ensure that all Products carry intellectual property rights notices relating to the existence and ownership of their respective relevant intellectual property rights in the forms specified under U.S. law and/or the provisions of the Paris, Berne and Universal Copyright Conventions.

**3.    LICENSES.**

**3.1.    CLI License.**  CLI hereby grants to Charger, under the CLI Intellectual Property Rights, a non-exclusive, worldwide, perpetual, irrevocable, fully paid license to make, have made, use sell, offer for sale and import Products in the Charger Field of Use.  Charger may sublicense the foregoing rights to any Affiliate and may sublicense to third parties the foregoing right to make the Products for Charger or its Affiliates; other than the foregoing, the license to Charger in this Section 3.1 is not sublicenseable.

**3.2.    Charger License.**  Charger hereby grants to CLI, under the Charger Intellectual Property Rights, a non-exclusive, worldwide, perpetual, irrevocable, fully paid license to make, have made, use sell, offer for sale and import Products in the CLI Field of Use.  CLI may sublicense to third parties the foregoing right to make Products for CLI; other than the foregoing, the license to CLI in this Section 3.2 is not sublicenseable.

CONFIDENTIAL

**3.3.    No Obligations.**  Notwithstanding the licenses granted pursuant to Sections 3.1 nd 3.2, neither party shall be obligated to transfer any technology or provide any technology or ipport to the other party or the other party's Customers.

**3.4.    License to Perform Assembly.**  Charger hereby grants to CLI a license, without ght to sublicense, under the Charger Intellectual Property Rights to all rights necessary for CLI ɔ perform its obligations under that certain Facilities and Services Agreement between CLI and harger dated the date hereof.

**3.5.    Notice of Infringement.**  If either party learns of a third party infringement of the harger Intellectual Property Rights or the CLI Intellectual Property Rights, that party shall romptly notify the other party of such fact.

.    SPECTRUMSAVER.  The parties acknowledge and agree that SpectrumSaver was excluded om CLI's assignment of assets pursuant to the Purchase Agreement.  Charger agrees that (1) it vill not assert any claims against CLI or CLI's Customers that the manufacture, use, offer for ale, sale and import of SpectrumSaver products, and improvements thereto, by CLI infringes the harger Intellectual Property Rights, and (2) such manufacture, use, sale, offer for sale and nport would not violate Section 2.2 of this Agreement, provided that, with respect to both items 1) and (2), neither CLI nor a third party to whom CLI sells or licenses such rights, modifies, nproves or otherwise redesigns the SpectrumSaver products after June 7, 1996 so as to make uch products compatible or compliant with the MPEG2 standards.

.    TRADEMARKS.  Subject to the terms and conditions of this Agreement, CLI hereby grants ɔ Charger a non-exclusive, perpetual (subject to the right to terminate as provided for in this ʲection), worldwide, royalty-free license to use CLI's trademarks "CDV" and "Compressed )igital Video" (the "Marks") in connection with Charger's marketing and sale of the Products.  In ddition, subject to the terms and conditions of this Agreement, CLI hereby grants to Charger a ion-exclusive, worldwide, royalty-free license to use, for a period of one year after the Effective )ate, the CLI trademarks "CLI" and "Compression Labs, Incorporated" in connection with the ncoders assembled by CLI pursuant to the Services Agreement.  Subject to the foregoing imitations, "CLI" and "Compression Labs, Incorporated" are included in the definition of Marks".  Charger agrees to state in appropriate places on all products using the Marks that the Marks are trademarks of CLI and to include the symbol ™ or ® as appropriate.  CLI grants no ights other than expressly granted hereunder, and Charger acknowledges that CLI claims xclusive ownership of the Marks and that the Marks are of worldwide renown.  Charger agrees iot to take any action inconsistent with such claim of ownership. Charger shall not adopt, use or ttempt to register any trademarks or trade names that are confusingly similar to the Marks in the ield of telecommunications or computer equipment or software or in such a way as to create ʲombination marks.  CLI may terminate, in whole or in part, Charger's license to use the Marks if, n CLI's reasonable discretion, Charger's use of the Marks does not conform to CLI's standards or such usage as provided to Charger in writing, and provided that such non-conforming use is iot cured within thirty (30) days after Charger receives written notice that such use does not ʲonform to CLI's standards.  One such use standard is that Charger shall manufacture products ʲearing the Marks in accordance with Charger's (or its Affiliates') normal manufacturing quality

CONFIDENTIAL

control procedures as specified in the Site Quality Manual dated August 10, 1995, as amended from time to time.

**6.    NO WARRANTIES.**  Except with respect to Intellectual Property (as defined in the Purchase Agreement), which are governed by the provisions of the Purchase Agreement, all Intellectual Property Rights and other deliverables delivered to the other party hereunder are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

**7.    CONFIDENTIALITY.**

**7.1.    Confidentiality.**  Each party hereto will maintain in confidence all Confidential Information disclosed by the other party hereto.  Neither party will use, disclose or grant use of such Confidential Information except as expressly authorized by this Agreement.  Each party will use at least the same standard of care as it uses to protect its own confidential information of a similar nature to ensure that its employees, agents or consultants do not disclose or make any unauthorized use of such Confidential Information, and each party represents that such standard of care is at least that customarily employed in the industry to protect the confidentiality of such information.    Notwithstanding the foregoing, each party shall require its employees and consultants, if such employee or consultant has not already done so, to sign confidentiality and nondisclosure agreements with such party consistent with the confidentiality requirements set forth herein.  Each party will promptly notify the other party upon discovery of any unauthorized use or disclosure of the Confidential Information.

**7.2.    Exceptions.**  The obligations of confidentiality contained in Section 7.1 will not apply to the extent that it can be established by the receiving party by competent proof that such Confidential Information:

**(a)**    was already known to the receiving party, other than under an obligation of confidentiality, at the time of disclosure by the other party;

**(b)**    was generally available to the public or otherwise part of the public domain at the time of its disclosure to the other party;

**(c)**    became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the receiving party in breach of this Agreement;

**(d)**    was disclosed to the receiving party, other than under an obligation of confidentiality, by a third party who had no obligation to the other party not to disclose such information to others;

**(e)**    was independently developed by the receiving party without the use of such Confidential Information; or

**(f)**    was disclosed by the owner to a third party without any restrictions on disclosure.

CONFIDENTIAL

**7.3.  Authorized Disclosure.** Each party may disclose Confidential Information to manufacturing sublicensees provided that such disclosure is made pursuant to a nondisclosure agreement which contains provisions at least as protective of the other party's interests as those contained in this Section 7. Each party may disclose the Confidential Information to the extent such disclosure is reasonably necessary in filing or prosecuting patent applications, prosecuting or defending litigation or complying with applicable laws, court orders or governmental regulations, provided that if such party is required to make any such disclosure of the Confidential Information it will to the extent practicable give reasonable advance notice to the other party of such disclosure requirement and, except to the extent inappropriate in the case of patent applications, will use its best efforts to secure confidential treatment of such information required to be disclosed. The parties acknowledge that the sale of the Products may necessarily disclose Confidential Information of the parties and the parties agree to use commercially reasonable efforts to limit such disclosure.

**8.    GENERAL.**

**8.1.  Bankruptcy.** All rights and licenses granted under or pursuant to this Agreement by each party are, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.

**8.2.  Assignment.** This Agreement and each and every covenant, term and condition hereof shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Either party may assign its rights and obligations hereunder, in whole or in part, to a successor in interest to all or substantially all of the assigning party's business, business unit or product line to which this Agreement or such party's rights and obligations relate, provided that the party to which such rights are assigned assumes in writing the obligations corresponding to such rights. CLI may otherwise assign this Agreement or other rights under this Agreement to third parties provided that CLI notifies Charger in writing of the identity of the potential assignee and the terms of such potential assignment and Charger shall have 30 days in which to accept such terms in writing and become CLI's assignee on such terms, in which event the assignment to Charger shall be consummated as soon as reasonably possible. In the event that Charger does not accept the terms of such assignment within the 30 day period, CLI may consummate the assignment with the specified third party on terms no more favorable to the third party than the terms offered to Charger. Any assignee must consent in writing to the terms of this Agreement. Any other assignment of this Agreement or rights or obligations hereunder, by operation of law or otherwise, shall be made only with the other party's prior written consent, and any assignment made in violation of the foregoing is void and of no effect.

**8.3  Further Assurances.** Each party will execute all documents and take all actions necessary or desirable to effectuate the parties' intent under this Agreement as reasonably requested by the other party and at the requesting party's expense. To effect the provisions of Section 2.1 and the terms of the Purchase Agreement, concurrently with the execution of this Agreement, each party shall execute, and cooperate in recording with the appropriate governmental authorities, the assignment documents attached hereto as Exhibits D and E.



**8.4.    Equitable Remedies.** The parties acknowledge and agree that any breach of this Agreement may cause irreparable harm for which money damages may be inadequate and therefore the non-breaching party shall be entitled to injunctive relief, without obligation to post a bond, to prevent a breach or continuation of a breach, in addition to any other remedies available at law.

**8.5.    Export Control.** With respect to the distribution or sale of any Products, each party shall fully comply with the export administration and control laws and regulations of the United States of America, as such may be amended from time to time. The parties agree not to take any action that would cause the other party to violate the U.S. Foreign Corrupt Practices Act of 1977, as amended.

**8.6.    Independent Contractors.** Nothing contained in this Agreement shall be construed so as to make the parties agents, partners or joint venturers or, except as explicitly set forth herein, to permit either party to bind the other party to any agreement or purport to act on behalf of the other party in any respect.

**8.7.    Waivers and Modifications.** Except as otherwise provided herein, no waiver or modification of any of the terms of this Agreement shall be valid unless in a writing signed by both parties. Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default hereunder in one or more instances shall not be construed as constituting a continuing waiver or as a waiver in other instances.

**8.8.    Severability.** If any term or provision of this Agreement shall for any reason be held to be invalid, such invalidity shall not affect any other term or provisions hereof, and this Agreement shall be interpreted and construed as if such term or provision had never been contained herein.

**8.9.    Notices.** All notices hereunder must be in writing and shall be given or made at the respective addresses of the parties as set forth above, unless notification of a change of address is given. All notices hereunder shall be mailed by certified or registered mail, return receipt requested, or sent by overnight courier, or by confirmed facsimile. Any notice given pursuant to this Agreement by mail shall be considered effective three days after mailing. Any notice sent by overnight courier shall be considered effective one day after mailing. The date of transmitting any notice sent by facsimile shall be deemed to be the date the notice is transmitted.

**8.10.    Headings.** The section headings of this Agreement are inserted only for convenience and shall not be construed as part of this Agreement.

**8.11.    Mediation.** Within 15 days of notice of any dispute, the parties agree that the parties shall try in good faith to settle any dispute arising hereunder by non-binding mediation prior to the commencement of any litigation (other than an injunction).

**8.12.    Governing Law.** This Agreement shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

Any suit hereunder may be brought in the federal or state courts of Santa Clara County, California, and Charger hereby consents to the jurisdiction thereof. In no event shall this Agreement be governed by the United Nations Convention on Contracts for the International Sale of Goods.

**8.13.  Force Majeure.**  Neither party shall be liable for delays in performance of, or failure to perform, any of its obligations hereunder occasioned by any cause beyond its reasonable control, including, but not limited to, war, civil disturbance, labor difficulties, fire, flood, earthquake, defaults or delays of common carriers, suppliers, or governmental laws, acts, or occurrences. Any such delay shall effect a corresponding extension of performance date.

**8.14.  Entire Agreement.**  This Agreement, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent that any provision of this Agreement conflicts with the Purchase Agreement with respect to any provisions applicable to the Jointly Owned Patents and any Intellectual Property (as defined in the Purchase Agreement) assigned under the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

CONFIDENT

IN WITNESS WHEREOF, the parties hereto have this day caused this Agreement to be executed by their duly authorized officers.

**Compression Labs, Incorporated**                    **Charger Industries, Inc.**


By: _____                         By: _____

Title: _Pres., CEO._____                    Title: _____


**CONFIDENTIAL**

IN WITNESS WHEREOF, the parties hereto have this day caused this Agreement to be executed by their duly authorized officers.

**Compression Labs, Incorporated**                    **Charger Industries, Inc.**


By:_____                    By:_____

Title:_____                    Title:___Vice President_____

CONFIDENTIAL

26423 v4/PA
KDZ051.DOC                                   9.

## EXHIBIT A

## CLI INTELLECTUAL PROPERTY RIGHTS

U.S. Patent Number 4,710,813

U.S. Patent Application number 08-486279

All trade secrets and know how associated with the foregoing patent and patent application

CONFIDENTIAL

26423 v4/PA
KDZ05!.DOC

1.

## EXHIBIT B

## CHARGER INTELLECTUAL PROPERTY RIGHTS

U.S. Patent Numbers 4,385,363 and 5,506,844

U.S. Patent Application number 08-162511

All trade secrets and know how associated with the foregoing patents and patent application

All trade secrets and know how developed by CLI's Research and Development Department (excluding trade secrets and know how developed by the BPG) that were made available both to BPG and Videoconferencing Products Group and that were assigned to Charger pursuant to the Purchase Agreement.

CONFIDENTIAL

## EXHIBIT C

## JOINTLY OWNED PATENTS

U.S. Patent No. 4,302,775
U.S. Patent No. 4,394,774
U.S. Patent No. 4,541,012 and corresponding foreign patents (France Patent No. 0084270; England Patent No. P3271502,8; Canada Patent No. 1209266)
U.S. Patent No. 4,698,672
U.S. Patent No. 4,704,628

CONFIDENTIAL

## EXHIBIT D

## PATENT ASSIGNMENTS

CONFIDENTIAL

CONFIDENTI

## PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT ("Assignment") is made and entered into as of this 24th day of June, 1996, ("Effective Date"), by and between Compression Labs, Incorporated, a Delaware corporation, with its principal office at 2860 Junction Avenue, San Jose, California 95134 ("Assignor"), and Charger Industries, Inc. a California corporation, with its principal office at 6262 Lusk Boulevard, San Diego, California 92121 ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 7, 1996 ("Asset Purchase Agreement"), pursuant to which Assignor has agreed to sell and Assignee has agreed to purchase the assets, properties and rights pertaining to the Business as defined in the Asset Purchase Agreement;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in, to and under those United States patents and patent applications identified and set forth on Schedules A and B respectively (the "Patents"); and

WHEREAS, Assignee wishes to acquire and Assignor wishes to assign the entire right, title and interest in and to the Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer and set over to Assignee, the entire right, title and interest in and to the Patents, for the United States and for all foreign countries, including any

GICLI3A.NH
June 24, 1996

- 1 -

CONFIDENTIAL

continuations, divisions, continuations-in-part, reissues, reexaminations, extensions or foreign equivalents thereof, and including the subject matter of all claims which may be obtained therefrom for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made; together with all income, royalties, damages or payments due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Patents, with the right to sue for, and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns, or other legal representatives.

Assignor authorizes and requests the Commissioner of Patents and Trademarks to record Assignee as owner of the Patents, including any continuations, divisions, continuations-in-part, reissues, reexaminations or extensions thereof, and to issue any and all letters patent of the United States thereon to Assignee, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of Assignee, its successors, assigns or other legal representatives.

Assignor shall provide Assignee, its successors, assigns or other legal representatives, cooperation and assistance at Assignee's request and expense (including the execution and delivery of any and all affidavits, declarations, oaths, exhibits,

GICLI3A.NH
June 24, 1996

CONFIDENTIAL

assignments, powers of attorney or other documentation as may be reasonably required): (1) in the preparation and prosecution of any applications covering the inventions assigned herein; (2) in the prosecution or defense of any interference, opposition, reexamination, reissue, infringement or other proceedings that may arise in connection with any of the patent rights assigned herein, including, but not limited to, testifying as to any facts relating to the patent rights assigned herein and this Assignment; (3) in obtaining any additional patent protection that Assignee may deem appropriate which may be secured under the laws now or hereafter in effect in the United States or any other country; and (4) in the implementation or perfection of this Assignment.

Except with respect to Intellectual Property (as defined in the Asset Purchase Agreement), which are governed by the provisions of the Asset Purchase Agreement, the Patents are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

This Assignment shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

This Assignment, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent any provision of this Assignment conflicts with the

GICLI3A.NH
June 24, 1996

Asset Purchase Agreement or the License and Co-Ownership Agreement dated June __, 1996 between the parties, with respect to any provisions applicable to the Marks, the terms of such other agreements shall prevail.

         *         *         *         *         *         *

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 4 -

IN TESTIMONY WHEREOF, the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this 24th day of June, 1996.

COMPRESSION LABS, INCORPORATED

Name: _Thomas G. Trimm._

Title: _President, CEO._

CHARGER INDUSTRIES, INC.

Name: _Susan M. Meyer_

Title: _Vice President_

STATE OF California )
                    ) SS.
COUNTY OF Santa Clara )

On this 24th day of June, 1996 there appeared before me Thomas G. Trimm, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Compression LAS, Incorporated

Notary Public

SALLY ZUMBA
Comm. #1005103
NOTARY PUBLIC -CALIFORNIA
SANTA CLARA COUNTY
Comm. Expires Sept. 29, 1997

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK )

On this 24th day of June, 1996, there appeared before me Susan M. Meyer, personally known to me, who acknowledged that she signed the foregoing Assignment as his her voluntary act and deed on behalf and with full authority of Charger Industries, Inc.

"OFFICIAL SEAL"
Loretta M. McKnight
Notary Public, State of Illinois
My Commission Expires 2/9/98

Notary Public

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 5 -

## SCHEDULE A

## U.S. PATENTS

| Title | Patent No. | Issue Date |
|---|---|---|
| Discrete Cosine Transformer | 4,385,363 | |
| Method for Configuring a Statistical Multiplexer to Dynamically Allocate Communication Channel Bandwidth | 5,506,844 | |

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 6 -

## SCHEDULE B

## U.S. PATENT APPLICATIONS

| Title | Serial No. | Filing Date |
|-------|-----------|-------------|
| Detelecine | 08-162511 | |

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 7 -